IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


IN RE HUFFY CORPORATION          :
SECURITIES LITIGATION            :

                                       Case No. 3:05cv028

                       :

                                  JUDGE WALTER HERBERT RICE

_____

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN
PART DEFENDANTS' MOTION TO DISMISS (DOC. #24); PLAINTIFFS'
AMENDED COMPLAINT (DOC. #22) DEEMED AMENDED; NO
FURTHER AMENDED COMPLAINT NECESSARY; STAY OF DISCOVERY
VACATED

_____


        This is a putative class action, predicated upon alleged securities fraud in

connection with the purchase of publically traded securities of Huffy Corporation

("Huffy").[1]   The putative class is defined as persons who purchased shares of

Huffy stock during the class period, i.e., between April 16, 2002, and August 13,

2004.  Plaintiffs' Amended Complaint (Doc. #22) at ¶ 1.[2]  This litigation arises out

of Huffy's acquisition of Gen-X, a Canadian manufacturer of snowboards, in-line

skates, golf clubs, hockey equipment and other types of sporting goods.  Id. at

_____

[1]Since Huffy is in bankruptcy, it is not a party herein.

[2]The named Plaintiffs in this litigation are the Lead Plaintiffs, and their most recent
pleading is captioned "Consolidated Amended Complaint."  For sake of simplicity,
however, this Court will refer to the Lead Plaintiffs as Plaintiffs and their
Consolidated Amended Complaint as their Amended Complaint.

¶ 2.  The Plaintiffs have named four former executives of Huffy as Defendants herein, to wit: Don Graber ("Graber"), who is alleged to have been its President and CEO from the beginning of the class period until January 31, 2004 (id. at ¶ 14); Timothy Howard ("Howard"), who is alleged to have served as a Vice President of Huffy and its Corporate Controller and principal accounting officer from the beginning of the class period until July 1, 2004 (id. at ¶ 15); Robert Lafferty ("Lafferty"), alleged to have served as Huffy's Vice President of Finance, CFO and Treasurer throughout the class period (id. at ¶ 16); and Paul D'Aloia ("D'Aloia"), who is alleged to have served in a number of capacities at Huffy during the class period, culminating as its CEO from January 7, 2004, through the end of that period (id. at ¶ 17).[3]  In their Amended Complaint (Doc. #22), the Plaintiffs seek to impose liability on the Defendants in accordance with §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), as well as under Rule 10b-5, promulgated by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

This case is now before the Court on the Defendants' Motion to Dismiss (Doc. #24), wherein they argue that the Plaintiffs' Amended Complaint fails to meet the pleading standards of Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and § 21D(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).[4]  In support of that assertion, the Defendants

[3]Plaintiffs have not explained how Graber and D'Aloia both served as Huffy's CEO, from January 7, 2004, through the end of that month.

[4]Plaintiffs have requested that the Court conduct oral argument on this motion. The parties have filed more than 250 pages of legal memoranda and have submitted 18 supplemental memoranda, after the close of the briefing permitted by the local rules.  Given such extensive briefing, there is no reason to expect that

have presented five bases for dismissal.  See Doc. #24 at 2 (the first).  Rather than initially cataloguing the allegations Plaintiffs have set forth in their 121-page, 304-paragraph Amended Complaint (Doc. #22),[5] this Court will set forth a brief synopsis of the central allegations upon which the Plaintiffs' claims are based, following which it will review the procedural standards that are applicable to motions such as that filed by the Defendants herein.  The Court will then turn to the parties' arguments concerning the five bases for dismissal the Defendants have set forth in their motion.  During that analysis, the Court will conduct a more through review of the relevant allegations in the Plaintiffs' Amended Complaint (Doc. #22).

As indicated, this litigation arises out of the decision of Huffy to purchase Gen-X.  The Plaintiffs allege in their Amended Complaint that the acquisition was a "disaster," because Gen-X's costs were not controlled, its inventory was in a state of disarray, its invoices had not been collected and its bills were unpaid.  Doc. #22 at ¶ 3.  Plaintiffs also contend that the "defendants" thereafter misrepresented the value of the assets Huffy had acquired and the impact of the acquired product lines on Huffy's revenue and earnings and that those misrepresentations caused Huffy's securities to trade at an inflated price.  Id. at ¶¶ 4-5.  In that pleading, Plaintiffs also categorize failings of Huffy, prior to the acquisition of Gen-X and the beginning of the class period, including investing in the manufacture of fad scooters that it

_____

oral argument would enlighten the Court, if Plaintiffs have not been able to cogently state their arguments in the numerous and lengthy memoranda they have filed in this matter.  Therefore, the Court will decline to grant the Plaintiffs' request that it schedule oral argument herein.

[5]Not surprisingly, many of those paragraphs contain numerous sub-paragraphs.

could not sell, failing in its efforts to purchase the assets of its former competitor, Schwinn, and having its largest customer, Kmart, which accounted for more than one-third of its sales, declare bankruptcy.  Id. at ¶ 30.

According to the Plaintiffs, the Defendants issued materially false and misleading statements during the class period, concerning:

> (1) the "extensive due diligence" purportedly performed by defendants prior to the acquisition of Gen-X; (2) the value of the assets acquired from Gen-X; (3) the performance of Gen-X after the acquisition and its impact on Huffy's financial results; and (4) Huffy's financial results and condition, and its future prospects for profitability.

Id. at ¶ 89.  In particular, the Plaintiffs have identified the following as sources of such statements:

1.  A press release issued by Huffy on April 16, 2002, announcing its financial results for the First Quarter of Fiscal Year 2002 (id. at ¶¶ 90-94);

2.  A press release issued by Huffy on June 17, 2002, announcing its agreement to acquire Gen-X (id. at ¶¶ 95-96);

3.  Huffy's S-4 Registration Statement, filed on July 5, 2002, and Amended S-4 Registration Statement, filed on July 29, 2002, setting forth information concerning the merger between Huffy and Gen-X and recommending shareholder approval (id. at ¶¶ 97-100);

4.  Huffy's release of information concerning its financial results for the Second Quarter of Fiscal Year 2002, including a press release, conference calls on July 16, 2002, in which Lafferty and Graber participated, and Huffy's report on Form 10-Q ("10-Q Report") for that period (id. at ¶¶ 101-108 and subparagraphs);

5.  A press release issued by Huffy on November 13, 2002, a conference call conducted the following day and Huffy's 10-Q Report, all concerning its financial

results for the Third Quarter of Fiscal Year 2002, as well as prospects for the future (id. at ¶¶ 109-118 and subparagraphs);

6.   A press release issued by Huffy on January 9, 2003, concerning Huffy's financial results for the Fourth Quarter of Fiscal Year 2002 (id. at ¶ 119);

7.   A press release issued by Huffy on February 11, 2003, conference calls conducted by Graber and Lafferty that day, and Huffy's Form 10-K Report ("10-K Report"), all concerning its financial results for the Fourth Quarter of Fiscal Year 2002, as well as for all of that Fiscal Year, and its prospects for the future (id. at ¶¶ 120-130 and subparagraphs);

8.   A press release issued by Huffy on April 16, 2003, a conference call conducted by Graber and Lafferty that day, and Huffy's 10-Q Report, all concerning its financial results for the First Quarter of Fiscal Year 2003, and its prospects for the future (id. at ¶¶ 131-140 and subparagraphs);

9.   A press release issued by Huffy on July 15, 2003, a conference call conducted by Graber and Lafferty the following day, and Huffy's 10-Q Report, all concerning its financial results for the Second Quarter of Fiscal Year 2003 (id. at ¶¶ 141-149 and subparagraphs);

10.   An announcement by Huffy on September 10, 2003, that it was lowering its expectations for the full-year sales for Fiscal Year 2003 to between $455 and $460 million from between $470 and $480 million (id. at ¶ 150);

11.   A press release issued by Huffy on October 15, 2003, a conference call conducted by Graber the following day, and Huffy's 10-Q Report, all concerning its financial results for the Third Quarter of Fiscal Year 2003, and its prospects for the future (id. at ¶¶ 151-159 and subparagraphs);

12.  Huffy's projection on December 1, 2003, that it would suffer a loss in the Fourth Quarter of Fiscal Year 2003, that earnings for the entire year would fall short of previous expectations and that sales would be even lower (id. at ¶ 160);

13.  A conference call conducted on December 2, 2003, during which Graber, Lafferty and D'Aloia attempted to explain Huffy's disappointing projection announced the previous day (id. at ¶¶ 161-162);

14.  Huffy's announcement of December 31, 2003, that it had suffered a net loss for Fiscal Year 2003, of nearly $1.4 million (id. at ¶ 163);

15.  Huffy's announcement of January 7, 2004, that Graber would retire as CEO effective the January 31st, and that he would remain as Chairman of the Board throughout the remainder of 2004 (id. at ¶ 164);

16.  Huffy's press release of January 15, 2004, that its loss for the Fourth Quarter of Fiscal Year 2003 would be substantially worse than anticipated and that, as a result, it now expected a modest loss for that Fiscal Year, as opposed to the previously anticipated profit of $0.08 to $0.10 earnings per share (id. at ¶ 165);

17.  Huffy's press release of February 17, 2003, announcing that it suffered a net loss of $11.8 million, or $0.74 per share, for the Fourth Quarter of Fiscal Year 2003, and a net loss of $7.5 million, or $0.49 per share, for 2003, and that Huffy expected to realize a profit of $0.22 to $0.27 per share for 2004 (id. at ¶ 167);

18.  A conference call conducted on February 17, 2004, during which Lafferty and D'Aloia "continued to falsely assure investors that Huffy's problems were being managed, while failing to disclose the extent of its problems with its lenders and suppliers" and D'Aloia claimed that the snowboard and golf lines of Gen-X had

"'finished the year with solid earnings and … strong revenue growth'" (id. at ¶ 169);

19.  Huffy's 10-K Report for Fiscal Year 2003 and 10-Q Report for the Third Quarter of that Fiscal Year, which, inter alia, contained incomplete disclosures, downplayed the significance of Huffy's debt and failed to disclose the full extent of the problems at Gen-X (id. at ¶¶ 170-175 and subparagraphs);

20.  Huffy's press release of April 13, 2004, announcing that, although its sales figures were in line with expectations, initial income figures indicated that the loss for the First Quarter of Fiscal Year 2004 would be greater than anticipated, significantly higher than the loss for the First Quarter of the previous Fiscal Year (id. at ¶ 177);

21.  D'Aloia's comments on the information set forth in that press release, to the effect that the loss was primarily related to the performance of Gen-X including significantly higher than normal charges related to customer returns and deductions (id. at ¶ 178);

22.  Huffy's press release on April 29, 2004, announcing that it would not return to profitability in Fiscal Year 2004 and that it had retained the firm of Lazard Freres & Co., in order "to explore strategic alternatives, including the sale of the Company or of product segments within the Company" (id. at ¶ 179);

23.  Huffy's press release issued on May 6, 2004, announcing that it was delaying the release of its results for the First Quarter of Fiscal Year 2004, in part as a result of a review of certain intangible assets and deferred tax assets (id. at ¶ 180);

24.  Huffy's press releases issued on May 17, 2004, and May 24, 2004, announcing further delays in the release of results for the First Quarter of Fiscal Year 2004 (id. at ¶¶ 181-183);

25.  Huffy's June 9, 2004, announcement that it had received a warning from the New York Stock Exchange, indicating that its (Huffy's) listing on that exchange was at risk because of the recent decline in its market capitalization and anticipated significant loss for the First Quarter of Fiscal Year 2004 (id. at ¶ 184); and

26.  Huffy's press release issued on August 13, 2004, indicating that it would restate its results for Fiscal Year 2003, and that it anticipated a loss in the range of $70.0 million to $72.0 million for the First Quarter of Fiscal Year 2004 (id. at ¶ 185).[6]

       With many of the foregoing allegations, the Plaintiffs also claim that the Defendants made optimistic statements about Huffy's anticipated future performance, optimism which would prove to be unwarranted.  As can be seen, therefore, the cornerstone of the Plaintiffs' claims are that Huffy, in an already weakened condition as a result of the loss of its largest customer and its failure to purchase Schwinn, made the disastrous acquisition of Gen-X, and in the process of

_____

[6]In addition to the foregoing alleged materially false and misleading statements, the Plaintiffs contend that the Defendants deliberately misled investors, by permitting Huffy to violate certain generally accepted accounting principles ("GAAP") by doing the following, to wit: overvaluing the trademarks, goodwill and other assets of Gen-X; improperly booking deferred tax assets acquired from Gen-X; improperly accounting for customer deductions, credits, accounts receivable and inventory reserves; violating GAAP's segment reporting requirements; and improperly recognizing and reporting revenue.  See Doc. #22 at ¶¶ 188-229 and 235-236.

acquiring Gen-X and thereafter, the Defendants made numerous materially false and misleading statements, concerning that acquisition and Huffy's financial condition, while releasing some negative information which was overshadowed by optimistic forecasts for the future.

Having reviewed the central allegations set forth in Plaintiffs' Amended Complaint (Doc. #22), the Court turns to a review of the procedural standards it must apply when ruling on the Defendants' Motion to Dismiss (Doc. #24), in particular Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA.

Rule 9(b) provides:

(b) Fraud or Mistake; Conditions of Mind.  In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

The Sixth Circuit has interpreted Rule 9(b) as requiring the plaintiff to "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."  Sanderson v. HCA–The Healthcare Co., 447 F.3d 873, 877 (6th Cir.) (internal quotation marks and citations omitted), cert. denied, 127 S.Ct. 303 (2006).

In League of United Latin American Citizens v. Bredesen, 500 F.3d 523 (6th Cir. 2008), the Sixth Circuit restated the standards which a District Court must apply when determining whether to dismiss a complaint, pursuant to Rule 12(b)(6), for failure to state a claim upon which relief can be granted:

> The court must construe the complaint in the light most favorable to plaintiffs, accept all well-pled factual allegations as true and determine whether plaintiffs undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief. Id. Though decidedly liberal, this standard does require more than bare assertions of legal conclusions. Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 361 (6th Cir. 2001). Plaintiffs' obligation to provide the "grounds" of their entitlement to relief requires more than labels and conclusions or a formulaic recitation of the elements of the cause of action. Bell Atlantic Corp. v. Twombly, — U.S. —, 127 S.Ct. 1955, 1964-65 (2007). The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief. Id. at 1965. To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory. Id. at 1969.

Id. at 527. See also Bishop v. Lucent Technologies, Inc., 520 F.3d 516 (6th Cir. 2008).

As a result of the adoption of the PSLRA, heightened pleading requirements have been imposed on plaintiffs bringing securities fraud actions. Those requirements are set forth in § 21D(b) of that statute, 15 U.S.C. § 78u-4(b). The Court will discuss those heightened pleading requirements when it turns to the Defendants' contention that it must dismiss the Plaintiffs' Amended Complaint, because they have failed to plead scienter in adequate fashion.

The Plaintiffs have referred to documents in order to support their claims, and the Defendants have appended documents to their motion, in an effort to demonstrate that those claims must be dismissed. Therefore, the Court will briefly review the standards which govern what matters outside the pleadings it may consider when ruling on a motion to dismiss, without transforming the motion into one for summary judgement, which, herein, this Court most decidedly will not do, given that the PSLRA prohibits the Plaintiffs from conducting discovery until the

Court has ruled upon the Defendants' Motion to Dismiss (Doc. #24).  Rule 12(d) of

the Federal Rules of Civil Procedure provides:[7]

> (d) Result of Presenting Matters Outside the Pleadings.  If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

In Tellabs, Inc. v. Makor Issues & Rights, Ltd., — U.S. —, 127 S.Ct. 2499 (2007),

a decision which is discussed below, the Supreme Court cited 5B Wright & Miller,

Federal Practice and Procedure § 1357, as setting forth types of such materials

which can be considered when ruling on a motion to dismiss a securities fraud

action.  Id. at 2509.  That section of the treatise provides, in pertinent part:

> In determining whether to grant a Federal Rule 12(b)(6) motion, district courts primarily consider the allegations in the complaint.  The court is not limited to the four corners of the complaint, however.  Numerous cases, as the note below reflects, have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment.

5B Wright & Miller, Federal Practice and Procedure § 1357 at 375-76 (footnote

omitted).  The Sixth Circuit has approved of the use of each of those types of

materials, when ruling on a motion to dismiss, without converting same to a

motion for summary judgment.  See e.g., Jackson v. City of Columbus, 194 F.3d

737, 745 (6th Cir. 1999) (District Court may consider documents referred to in

---

[7]The principles set forth in Rule 12(d) were formerly included as part of Rule 12(b). Those principles were moved to Rule 12(d) as part of the 2007 amendments to the Rules of Civil Procedure, effective December 1, 2007.  That change was "intended to be stylistic only."  Committee Note to 2007 Amendment to Rule 12.

plaintiff's complaint and central to his claim, public records, matters of which a court may take judicial notice and decisions of governmental agencies).  See also Wyser-Pratte Management Corp. Inc. v. Telxon Corp., 413 F.3d 553, 560 (6th Cir. 2005); Nieman v. NLO, Inc., 108 F.3d 1546, 1554 (6th Cir. 1997) (quoting Wright & Miller, supra, with approval).  Of course, where the submitted materials "capture[] only part of the incident and would provide a distorted view of the events at issue, … we do not require a court to consider that evidence on a 12(b)(6) motion."  Jones v. City of Cincinnati, 521 F.3d 555, 562 (6th Cir. 2008) (internal quotation marks omitted).

Based upon the foregoing discussion of legal principles, this Court concludes that, when ruling on the Defendants' Motion to Dismiss (Doc. #24), it is appropriate to consider the public securities filings by Huffy and statements to analysts and to the press (i.e., conference calls and press releases) which have been referred to in the Plaintiffs' Amended Complaint (Doc. #22), given that those materials are central to Plaintiffs' claims.[8]  Jackson, supra (holding that District Court may consider documents referred to in plaintiff's complaint and central to his claim).  It is also appropriate for the Court to consider other of Huffy's securities filings which Defendants have attached to their motion, even though Plaintiffs did not refer to those filings in their Amended Complaint (Doc. #22), because those filings are public records.  The Plaintiffs contend that the Defendants committed securities fraud, in part, as a result allegedly false statements in some of Huffy's public securities filings.  Those allegations render other such filings integral to the

---

[8]Those materials are central to Plaintiffs' claims, because they are the source of the Defendants' allegedly fraudulent statements.

Plaintiffs' claims.  Thus, although Plaintiffs have argued to the contrary, this Court will consider those other filings when ruling on the instant motion.[9]

Herein, the parties also dispute whether this Court can consider a complaint filed by the Trustee of the Huffy Recovery Trust ("Trustee") in Huffy's bankruptcy proceeding.  That question was brought before the Court by the Plaintiffs' Request for Judicial Notice in further Opposition to Defendants' Motion to Dismiss (Doc. #42), as supplemented by Doc. #45.  The Defendants have opposed that motion (see Doc. #46), and the Plaintiffs have filed a Reply Memorandum (Doc. #49) in support thereof.  In the complaint filed in Huffy's bankruptcy proceedings,[10] the Trustee has set forth claims against Graber, Howard and some of Huffy's other directors, alleging, inter alia, that those individuals had breached the fiduciary duty owed to Huffy by paying Graber nearly $2.7 million out of Huffy's Supplemental Executive Retirement Plan, on February 13, 2004, after the effective date of Graber's retirement, without determining whether Huffy was solvent at the time.

In their motion, the Plaintiffs argue that the allegations set forth in the Trustee's complaint counter the Defendants' argument that the allegations of scienter in the Amended Complaint (Doc. #22) are insufficient, since there is no allegation that they (Defendants) had a motive to misrepresent the impact of the

---

[9]In addition, the Plaintiffs contend that this Court cannot consider Huffy's press releases that are attached to the Defendants' motion, which were not referred to in the Amended Complaint.  See Doc. #28 at 8.  Since those documents are not public records, referred to in the Amended Complaint or matters of which it will take judicial notice, the Court will decline to consider them when ruling on the Defendants' motion.

[10]A copy of that pleading is attached to and authenticated by the Declaration of Mark Herman (Doc. #43).

Gen-X acquisition.  See Doc. #42 at 1 (citing Defendants' Motion to Dismiss (Doc. #24) and Reply Memorandum (Docs. #33).[11]  Plaintiffs also contend that the Trustee's complaint will add support to their allegations concerning the falsity of Defendants' allegedly fraudulent statements.  Id.  The Plaintiffs stress that they are not requesting that the Court take judicial notice of the truth of the allegations in the Trustee's complaint; rather, they request that the Court take such notice of the fact that those allegations have been set forth therein and that those allegations were made by an individual who has had custody of Huffy's internal books and records for two years.  Id. at 2-3.  Although the Plaintiffs have not expressly identified the portions of the Trustee's complaint of which they want this Court to take judicial notice, they have quoted ¶¶ 12-23 and 25-26 of that pleading.  Id. at 4-6.  The other allegations in the Trustee's complaint have not been mentioned in the Plaintiffs' motion.  Therefore, the Court concludes that the Plaintiffs are requesting only that the Court take judicial notice of ¶¶ 12-23 and 25-26 from the Trustee's complaint.  In opposition, the Defendants argue that the allegations in a complaint are not the subject of judicial notice, since that which has been plead in the Trustee's complaint are allegations rather than being facts.[12]

Judicial notice is governed by Rule 201 of the Federal Rules of Evidence, which provides in pertinent part:

a) Scope of rule.  This rule governs only judicial notice of adjudicative facts.

---

[11]Since the Plaintiffs did not include the cover page when assigning page numbers, the page numbered "1" is in actuality the second page of that document.

[12]The Defendants also argue that the Court should not take judicial notice, because the Plaintiffs have failed to specify what they are requesting the Court to judicially notice.  Given that this Court has interpreted the Plaintiffs' request as focusing upon ¶¶ 12-23 and 25-26 of the Trustee's complaint, the Court rejects the Defendants' argument in that regard.

(b) Kinds of facts.  A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) When discretionary.  A court may take judicial notice, whether requested or not.

(d) When mandatory.  A court shall take judicial notice if requested by a party and supplied with the necessary information.

(e) Opportunity to be heard.  A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

(f) Time of taking notice.  Judicial notice may be taken at any stage of the proceeding.

It is a matter of settled precedent in the Sixth Circuit that courts may take judicial notice of proceedings in other courts.  Lyons v. Stovall, 188 F.3d 327, 333 n. 3 (6th Cir. 1999).  As is indicated, however, Defendants argue that this Court cannot take judicial notice of the Trustee's complaint, because the matters set forth therein are allegations, rather than being facts.  In support of that proposition, the Defendants rely upon, inter alia, Nolte v. Capital One Fin. Corp., 390 F.3d 311 (4th Cir. 2004).  That decision arose out of an appeal by the plaintiffs from the dismissal of their securities fraud action and the District Court's denial of their request for leave to amend.  During the course of the appeal, the SEC initiated a civil action against one of the defendants, and the plaintiffs requested that the Fourth Circuit take judicial notice of the complaint filed by the SEC and the facts alleged therein.  The Fourth Circuit declined that request, concluding that Rule 201 authorizes courts to take judicial notice of indisputable facts alone and the allegations in the complaint filed by the SEC were not such facts.  Id. at 317 n.*. Herein, the Plaintiffs contend that Nolte is distinguishable, since they are not

requesting that the Court take judicial notice of the truth of the matters alleged in the Trustee's complaint, only that those allegations have been made.

This Court finds it unnecessary to resolve the parties' differences over the applicability of Rule 201 to the Trustee's complaint. It bears emphasizing that this case is not before the Court on a request for summary judgment, where this Court would be required to decide whether the <u>evidence</u>, which would include facts of which this Court can take judicial notice, raises genuine issues of material fact which must be resolved in a trial. Rather, this litigation is before the Court on the Defendants' Motion to Dismiss (Doc. #24), under which this Court must decide whether the <u>allegations</u> in Plaintiffs' Amended Complaint (Doc. #22), viewed through the prisms of Rules 9(b) and 12(b)(6) and the PSLRA, state a claim for relief. The Plaintiffs merely seek to have the Court consider the allegations set forth by the Trustee in his complaint, when it engages in that analysis. In effect, the Plaintiffs are requesting that the Court give them leave to amend to include the allegations set forth by the Trustee in his complaint. Such an amendment would be appropriate, even though it would occur after the Defendants' Motion to Dismiss (Doc. #22) had been fully briefed.[13] Cf. E.E.O.C. v. Ohio Edison Co., 7 F.3d 541, 546 (6th Cir. 1993) (holding in an appeal from the dismissal of the plaintiff's complaint pursuant to Rule 12(b)(6) that, when the papers before the Sixth Circuit indicate that the plaintiff could submit an amended complaint that would state a claim upon which relief can be granted, the proper course is to remand to permit the plaintiff to amend). However, rather than treating Plaintiffs' request that the Court take judicial notice as a motion for leave to amend, granting

---

[13]The Trustee's complaint was not filed until long after that motion had been fully briefed.

that motion and overruling the Defendants' Motion to Dismiss (Doc. #24) without prejudice, thus resulting in the Defendants filing a new motion seeking dismissal and the parties then engaging in a new round of briefing,[14] this Court will consider ¶¶ 12-23 and 25-26 of the Trustee's complaint, when it rules on the Defendants' Motion to Dismiss (Doc. #24).[15]   The Court will also consider the Defendants' arguments that, notwithstanding the allegations in that pleading, fatal deficiencies remain in the Plaintiffs' Amended Complaint.  See Doc. #46 at 11-17.[16]

---

[14]The Defendants argue that to permit the Plaintiffs to amend would in effect violate the spirit of the PSLRA.  See Doc. #46 at 8-9.  This Court does not agree with Defendants that, by considering the allegations set forth in ¶¶ 12-23 and 25-26 of the Trustee's complaint when ruling on Defendants' request for dismissal, it would violate the purpose of the PSLRA.  Notably, that statute does not contain language, which purports to limit the applicability of Foman v. Davis, 371 U.S. 178 (1962), wherein the Supreme Court stressed that leave to amend is to be freely given, and, thus, restrain the ability of courts to afford the plaintiff an opportunity to amend in an action governed by that statute.  Defendants, however, rely upon the decision of the Sixth Circuit in Miller v. Champion Enterprises, Inc., 346 F.3d 660 (6th Cir. 2003).   Therein, the plaintiffs appealed, inter alia, the decision of the District Court to deny them leave to amend in an action governed by the PSLRA. In concluding that the District Court had not abused its discretion in that regard (see, e.g., Ziegler v. Aukerman, 512 F.3d 777, 786 (6th Cir. 2008) (ruling on a motion for leave to amend is reviewed under an abuse of discretion standard); Janikowski v. Bendix Corp., 823 F.2d 945, 951 (6th Cir. 1987) (same)), the Miller court wrote, "the purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA."  346 F.3d at 692 (emphasis added).  Herein, the Plaintiffs have not previously sought or been given leave to amend.  On the contrary, they filed their Amended Complaint (Doc. #22), because this Court had granted the Defendants' request to consolidate four separate securities fraud lawsuits brought against them.  See Doc. #12. Therefore, the Sixth Circuit's admonition about repeated amendments is inapplicable herein.

[15]The Court deems Plaintiffs' Amended Complaint (Doc. #22) to be amended to reflect those allegations in the Trustee's complaint; therefore, no further amended pleading from Plaintiffs is necessary.

[16]Alternatively, the Defendants have also argued that it would be futile to consider the allegations in the Trustee's complaint when ruling on their motion.  To determine the validity of that argument, this Court would need to rule separately

As indicated, the Plaintiffs base their claims on §§ 20(a) and 10(b) of the Exchange Act and Rule 10b-5. Briefly, § 20(a) provides that anyone who, directly or indirectly, controls any person liable under any provision of the Exchange Act or of any rule or regulation promulgated thereunder shall be jointly and severally liable with and to the same extent as the entity that person controls. In <u>PR Diamonds, Inc. v. Chandler</u>, 364 F.3d 671 (6th Cir. 2002), the Sixth Circuit set forth the elements which must be established in order to impose liability under § 20(a):

> Section 20(a) thus establishes two requirements for a finding of control person liability. First, the "controlled person" must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder. Second, the "controlling person" defendant in a Section 20(a) claim must have directly or indirectly controlled the person liable for the securities law violation. "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

<u>Id</u>. at 696-97.

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security …, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, which is such a rule, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,

---

on the Defendants' request to dismiss the Plaintiffs' Amended Complaint (Doc. #22). Since it will not rule on that motion twice, the Court does not independently address Defendants' contention concerning futility.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  In Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336

(2005), the Supreme Court reviewed the elements of a claim under Rule 10b-5:

> In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements include:
> (1) a material misrepresentation (or omission), see Basic Inc. v. Levinson, 485 U.S. 224, 231-232 (1988);
> (2) scienter, i.e., a wrongful state of mind, see Ernst & Ernst [v. Hochfelder, 425 U.S. 185, 197, 199 (1976)];
> (3) a connection with the purchase or sale of a security, see Blue Chip Stamps [v. Manor Drug Stores, 421 U.S. 723, 730-731 (1975)];
> (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation," see Basic, supra, at 248-249 (nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in its absence);
> (5) economic loss, 15 U.S.C. § 78u-4(b)(4); and
> (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss, ibid.; cf. T. Hazen, Law of Securities Regulation §§ 12.11[1], [3] (5th ed.2005).

Id. at 341-42 (emphasis in the original).  See also Brown v. Earthboard Sports

USA, Inc., 481 F.3d 901, 917 (6th Cir. 2007).

The Defendants have presented five bases for dismissal in their motion,

arguing that the Plaintiffs have failed to allege in adequate fashion scienter, loss

causation, falsity/materiality and control person liability and that the group pleading

doctrine did not survive the enactment of the PSLRA.  See Doc. #24 at 2 (the

first).  As a means of analysis, the Court will address those propositions in the

above order, discussing, however, the group pleading doctrine first.  In addition to

arguing that this Court should dismiss the Plaintiffs' Amended Complaint

(Doc. #22), the Defendants argue that this Court should not permit Plaintiffs to

attempt to amend to cure any deficiencies in their current pleading.  See Doc. #24

at 86-88.  Not surprisingly, the Plaintiffs disagree.  See Doc. #28 at 86-87.  In the

event that this Court agrees with the Defendants that Plaintiffs' Amended

Complaint Doc. #22) must be dismissed, it will turn to the parties' arguments

concerning the question of whether Plaintiffs should be permitted to amend.


I .  Group Pleading

The genesis of the group pleading doctrine is the decision of the Ninth

Circuit in Wool v. Tandem Computers Inc., 818 F.2d 1433 (9th Cir. 1987), wherein

the court explained that doctrine:

> In cases of corporate fraud where the false or misleading information
> is conveyed in prospectuses, registration statements, annual reports, press
> releases, or other 'group-published information,' it is reasonable to presume
> that these are the collective actions of the officers.  Under such
> circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by
> pleading the misrepresentations with particularity and where possible the
> roles of the individual defendants in the misrepresentations.

Id. at 1440.  See also Winer Family Trust v. Queen, 503 F.3d 319, 335 (3d Cir.

2007) (noting that "the group pleading doctrine allows a plaintiff to plead that

defendants made a misstatement or omission of a material fact without pleading

particular facts associating the defendants to the alleged fraud"); In re Solv-Ex

Corp. Securities Litig., 210 F. Supp.2d 276, 283 (S.D.N.Y. 2000) (noting that the

group pleading doctrine permits plaintiffs to "rely on a presumption that statements

in prospectuses, registration statements, annual reports, press releases, or other

group-published information, are the collective work of those individuals with direct

involvement in the everyday business of the company") (internal quotation marks and citations omitted); In re Livent, Inc. Securities Litig., 78 F. Supp.2d 194, 219 (S.D.N.Y. 1999) (noting that the doctrine allows plaintiffs "to allege that misstatements contained in company documents may be presumed to be the work of the company's officers and directors").  The Sixth Circuit neither adopted nor rejected the group pleading doctrine either before or after the passage of the PSLRA.  City of Monroe Employees Retirement System v. Bridgestone Corp., 399 F.3d 651, 690 (6th Cir. 2005) (noting that "[t]his court has not taken a position on whether [the group pleading] exception exists" and that it was not necessary therein to decide the current viability of that doctrine).  With that overview of the group pleading doctrine, this Court turns to the question of whether that doctrine has survived the passage of the PSLRA.[17]

As is indicated above, the PSLRA requires that a complaint setting forth claims of securities fraud, inter alia, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b) (emphasis added).  In Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353 (5th Cir. 2004), the court held that the use of the phrase "the defendant" in § 21D(b) of the PSLRA meant that "may only reasonably be understood to mean 'each defendant' in multiple defendant cases, as it is inconceivable that Congress intended liability of any defendants to depend on whether they were all sued in a single action or were each sued alone in several separate actions."  Id. at 364-65.  As a consequence, the Southland Securities

---

[17]Parenthetically, it is of no import that Congress did not expressly abrogate the group pleading doctrine when it adopted the PSLRA, since that doctrine was the creation of courts, not of legislative imprimatur.  Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 363-64 (5th Cir. 2004).

<u>Corp.</u> court concluded that the group pleading doctrine did not survive the passage

of the PSLRA, assuming that it had previously been viable, for that reason and

because it conflicted with the pleading requirement established by that statute,

writing:

> The "group pleading" doctrine conflicts with the scienter requirement of the PSLRA because, even if a corporate officer's position supports a reasonable inference that he likely would be negligent in not being involved in the preparation of a document or aware of its contents, the PSLRA state of mind requirement is severe recklessness or actual knowledge.
>
> Therefore, we agree with the district court that the PSLRA requires the plaintiffs to "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud."  As such, corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded.  However, corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue.  Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement.  Various unattributed statements within documents may be charged to different individuals, and specific facts may tie more than one individual to the same statement.  And, the corporation itself may be treated as making press releases and public statements issued by authorized officers on its behalf, and statements made by its authorized officers to further the interests of the corporation.
>
> Consistent with our rejection of the "group pleading" doctrine, we do not construe allegations contained in the Complaint against the "defendants" as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.  While the plaintiffs aver in paragraph 21 of the Complaint that the individual defendants "each controlled the contents of and participated in writing INSpire's SEC filings, reports and releases," this conclusory allegation fails to specify which of these documents is attributable to each individual defendant, let alone which portions or statements within these documents are assignable to each individual defendant.

Id. at 365.  In Winer Family Trust, the Third Circuit reached the same conclusion, based upon similar reasoning.  503 F.3d at 335-36.  The Seventh Circuit has also concluded that the group pleading doctrine did not survive the enactment of the PSLRA.[18]  Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 602-03 (7th Cir. 2006), reversed on other grounds sub nom., Tellabs, Inc. v. Makor Issues & Rights, Ltd., — U.S. —, 127 S.Ct. 2499 (2007).[19]

In contrast, the Ninth and the Tenth Circuits have continued to apply the group pleading doctrine after the enactment of the PSLRA; however, those decisions merely followed precedent which predated the adoption of that statute, without discussing the impact of that statute on that doctrine.  Howard v. Everex Systems, Inc., 228 F.3d 1057 (9th Cir. 2000); Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1254 (10th Cir. 1997).  In addition, a number of District

_____

[18]The Seventh Circuit reached that conclusion solely in the context of deciding whether the plaintiffs had adequately alleged scienter.  In Winer Family Trust, the Third Circuit rejected the argument that, therefore, that decision should be construed narrowly, writing:

> Winer contends the Court of Appeals for the Seventh Circuit's decision to abolish the group pleading doctrine in Makor should be read narrowly as only abolishing group pleading for purposes of inferring scienter.  Winer agrees that group pleading cannot be used to prove scienter, but contends it can be used to attribute statements to Individual Defendants.  This argument is illogical.  See, e.g., D.E. & J Ltd. P'ship v. Conaway, 284 F. Supp.2d 719, 731 (E.D.Mich.2003) ("Where individual defendants are the target of the fraud allegations, it would be nonsensical to require that a plaintiff specifically allege facts regarding scienter as to each defendant, but to allow him to rely on group pleading in asserting that 'the defendant' made the statement or omission.").  If Winer could plead scienter with the specificity required by the PSLRA, it would not need to resort to the group pleading doctrine in the first place.

503 F.3d at 337 n. 6.

[19]In Tellabs, the Supreme Court did not disturb the Seventh Circuit's holding that the group pleading doctrine did not survive the enactment of the PSLRA, since the petitioners had not challenged that holding.  127 S.Ct. at 2511 n. 6.

Courts in this Circuit have held that the doctrine has continued vitality.  See, e.g., In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp.2d 527, 545 (S.D.Ohio 2000) (Sargus, J.).  However, other District Courts have reached the opposite conclusion.  See, e.g., D.E.&J Ltd. Partnership v. Conaway, 284 F. Supp.2d 719 (E.D.Mich. 2003).

This Court is convinced by the rationale adopted by the Third, Fifth and Seventh Circuits in, respectively, Winner Family Trust, Southland Securities Corp. and Tellabs.  The group pleading doctrine is antithetical to the pleading requirement for scienter set forth in § 21D(b) of the PSLRA.  Accordingly, this Court concludes that, assuming it was applicable in the Sixth Circuit before the adoption of the PSLRA, the group pleading doctrine has not survived that event.  Therefore, this Court will not utilize that doctrine in determining whether the Plaintiffs' Amended Complaint (Doc. #22) is in compliance with the applicable pleading standards.[20]

II.  Scienter

A major focus of the Defendants' Motion to Dismiss (Doc. #24) is that the Plaintiffs have failed to allege the element of scienter in adequate fashion.  The Defendants initially set forth arguments relating to the appropriate legal standards to apply when engaging in that analysis, following which they set forth their assertions as to why the Amended Complaint (Doc. #22) fails to meet those standards.  As a means of analysis, this Court will initially set forth applicable legal standards, about which there could be no dispute, following which it will turn to

---

[20]Since the Defendants have not identified the allegations in Plaintiffs' Amended Complaint which would not be actionable against which Defendant, should the Court reject the group pleading doctrine, this Court does not address that issue.

the Defendants' arguments concerning legal standards which differ from those

which the Court initially discusses.  The Court will then address the parties'

arguments concerning the application of those standards to the allegations in the

Plaintiffs' Amended Complaint.


A.  Legal Standards Concerning Scienter About Which There Could Be No Dispute

The Supreme Court has indicted that scienter is a "mental state embracing

intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S.

185, 193 n. 12 (1976).  Therein, the Court also noted that it was not necessary to

address the question of whether reckless behavior is sufficient for liability under

Rule 10b-5.  Id.  In Earthboard Sports, the Sixth Circuit discussed the requirement

of scienter:

> As we have noted elsewhere, scienter
>> is limited to those highly unreasonable omissions or
>> misrepresentations that involve not merely simple or even inexcusable
>> negligence, but an extreme departure from the standards of ordinary
>> care, and that present a danger of misleading buyers or sellers which
>> is either known to the defendant or is so obvious that the defendant
>> must have been aware of it.
> Platsis v. E.F. Hutton & Co., 946 F.2d 38, 40 (6th Cir. 1991) (citations and
> internal quotation marks omitted).  "In securities fraud claims based on
> statements of present or historical fact–such as the claims Plaintiffs bring in
> this case–scienter consists of knowledge or recklessness."  PR Diamonds,
> Inc. v. Chandler, 364 F.3d 671, 681 (6th Cir. 2004).

481 F.3d at 917-18.  See also Helwig v. Vencor, Inc., 251 F.3d 540, 548 (6th Cir.

2001) (en banc) (noting that the Sixth Circuit has long recognized recklessness as

a sufficient mental state to impose liability under § 10(b) and Rule 10b-5).  In PR

Diamonds, Inc. v. Chandler, 364 F.3d 671 (6th Cir. 2004), the Sixth Circuit noted

that recklessness is "'highly unreasonable conduct which is an extreme departure

from the standards of ordinary care'" and that "[w]hile the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." Id. at 681 and 684 (first quotation from Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1025 (6th Cir. 1979)).

As is indicated above, the pleading requirements adopted by the PSLRA are set forth in § 21D(b) of that statute, which provides in pertinent part:

> (b) Requirements for securities fraud actions
> (1) Misleading statements and omissions
> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
> > (A) made an untrue statement of a material fact; or
> > (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
> (2) Required state of mind
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b). The Third Circuit has indicated that the heightened pleading standards under the PSLRA is a reflection of the objective of Congress "to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." In re NAHC, Inc. Securities Litig., 306 F.3d 1314, 1332-333 (3d Cir. 2002) (citation omitted).[21]

---

[21]In Miller v. Champion Enterprises, Inc., 346 F.3d 660, 691-92 (6th Cir. 2003), the Sixth Circuit discussed with approval and quoted extensively from the decision of

In Tellabs, Inc. v. Makor Issues & Rights, Ltd., — U.S. —, 127 S.Ct. 2499 (2007), the Supreme Court held that, in determining whether the plaintiff has stated "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," as required by § 21D(b)(2), courts must consider competing inferences and that "an inference of scienter must be more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[22]  Id. at 2504-05.  The Tellabs Court also emphasized that the focus of the inquiry is on "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  Id. at 2509 (emphasis in the original).  In addition, the Supreme Court indicated therein that courts must consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Id. (citing 5B Wright & Miller, Federal Practice and Procedure § 1357).[23]

---

the Third Circuit in In re NAHC, Inc. Securities Litig.  Indeed, the Miller court included the language, which this Court has quoted from the Third Circuit decision, in a block quote from that decision.  However, since the Sixth Circuit did not actually hold that the purpose of the PSLRA's heightened pleading requirement is as stated by the Third Circuit, it is not appropriate to attribute the quoted language to the Sixth Circuit.

[22]Plaintiffs argue that, in ruling upon the Defendants' motion, this Court must draw all reasonable inferences in their favor.  See Doc. #28 at 3-4.  This Court rejects that assertion as it relates to scienter, given that the PSLRA and Tellabs expressly require a more than a reasonable inference of scienter.

[23]The Supreme Court decided Tellabs, after the Defendants' motion had been fully briefed.  However, the parties have filed supplemental memoranda addressing that decision (see Docs. ##57-59), which this Court has considered herein.

In Earthboard Sports, the Sixth Circuit reiterated that it applies the totality-of-the-circumstances test, in order to determine whether a plaintiff has met the pleading requirements of § 21D(b)(2) and set forth a non-exclusive list of factors which, among others, are considered when deciding whether the plaintiff has adequately alleged scienter:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

481 F.3d at 917 (quoting City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 683 (6th Cir. 2005)).  Since that list of factors was initially adopted by the Sixth Circuit in Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001) (en banc), this Court will refer to them as the "Helwig factors," as have the parties.  Parenthetically, in Helwig, the Sixth Circuit stressed that, while not exhaustive, the list is "at least helpful in guiding securities fraud pleading."  251 F.3d at 552.  Of course, given that the Tellabs Court directed courts to focus their inquiry on "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard" (127 S.Ct. at 2509 (emphasis in the original)), this Court will not consider each of those factors in isolation.

The PSLRA added § 21E to the Exchange Act as a safe harbor, limiting liability for forward-looking statements.[24]  That statute provides in pertinent part:

(c) Safe harbor
(1) In general
Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that--
(A) the forward-looking statement is--
    (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
    (ii) immaterial; or
(B) the plaintiff fails to prove that the forward-looking statement--
    (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
    (ii) if made by a business entity; was--

--------------------------------

[24]The PSLRA defines "forward-looking statement" as:
The term "forward-looking statement" means--
(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.
15 U.S.C. § 78u-5(i)(1).

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

(2) Oral forward-looking statements

In the case of an oral forward-looking statement made by an issuer that is subject to the reporting requirements of section 78m(a) of this title or section 78o(d) of this title, or by a person acting on behalf of such issuer, the requirement set forth in paragraph (1)(A) shall be deemed to be satisfied--

(A) if the oral forward-looking statement is accompanied by a cautionary statement--

(i) that the particular oral statement is a forward-looking statement; and

(ii) that the actual results might differ materially from those projected in the forward-looking statement; and

(B) if--

(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

15 U.S.C. § 78u-5(c).  Thus, in <u>PR Diamonds</u>, the Sixth Circuit noted that the safe harbor provision contained in the PSLRA renders scienter irrelevant for forward-looking statements accompanied by meaningful cautionary language and requires actual knowledge of the statements' false or misleading character for such statements not accompanied with meaningful cautionary language.  364 F.3d at 681 n. 3 (citing 15 U.S.C. § 78u-5(c)(1)(A) and (B)).  Under § 21E(b)(2)(A), a forward-looking statement "included in a financial statement prepared in

accordance with generally accepted accounting principles" is excluded from the safe harbor.[25]   15 U.S.C. § 78u-5(b)(2)(A).


## B.  Defendants' Arguments Concerning Additional Legal Standards

The Defendants have presented a number of legal propositions, which they contend are applicable to the resolution of the issue of whether Plaintiffs have adequately plead scienter, which will be addressed in the order presented.

First, they contend that only the most plausible inference can meet the requirement of § 21D(b)(2) that a plaintiff allege particularized facts giving rise to a strong inference of scienter.  See Doc. #24 at 14.  On the contrary, the Tellabs Court held that, to meet that requirement, an inference must be "at least as compelling as any opposing inference of nonfraudulent intent."  127 S.Ct. at 2505. Therefore, this Court rejects Defendants' legal argument that only the most plausible inference can meet the pleading burden established by § 21D(b)(2) of the PSLRA.

Second, Defendants contend that, in order to have complied with the requirement contained in § 21D(b)(2), the Plaintiffs must have alleged that the Defendants received concrete and personal benefits as a result of the alleged scheme.  Doc. #24 at 15.  In support thereof, the Defendants cite Albert Fadam Trust v. Am. Elec. Power Co., 334 F. Supp.2d 985 (S.D.Ohio 2004) (Marbley, J.). Therein, in the context of discussing why the plaintiffs' allegations of opportunity

---

[25]It cannot be questioned that the Defendants herein are included among those to whom the safe harbor is applicable.  See 15 U.S.C. § 78u-5(a)(2) (indicating that the safe harbor provision is applicable to a person acting on behalf of an issuer, such as Huffy).  Defendants' statements upon which the Plaintiffs claims are based were made while they were acting in behalf of Huffy.

and motive in that litigation were not sufficient to establish the requisite strong inference of scienter, the District Court wrote, "[t]he 'plaintiffs must assert concrete and personal benefit to the individual defendants resulting from the fraud.'"  Id. at 1015 (quoting In re K-tel International, Inc. Securities Litig., 300 F.3d 881, 894 (8th Cir. 2002)).  This Court cannot agree with the Defendants' argument in that regard.  As long as the inference of scienter from Plaintiffs' Amended Complaint is "at least as compelling as any opposing inference of nonfraudulent intent" (Tellabs, 127 S.Ct. at 2505), it does not matter whether any one or more or all of the Defendants personally derived a benefit from the alleged scheme.  In other words, the absence of such a benefit will not, in and of itself, prevent this Court from concluding that the Plaintiffs have met their burden of pleading scienter under the PSLRA.  That said, however, the existence or non-existence of such a benefit could certainly be important in determining whether Plaintiffs have met that burden.

Third, Defendants argue that an allegation that a defendant has violated generally accepted accounting principles ("GAAP"), in and of itself, is not sufficient to state a securities law claim.  Doc. #24 at 18-19.  This Court agrees, in part.  In PR Diamonds, the Sixth Circuit held that "'[t]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim.'"  364 F.3d at 684 (quoting In re Comshare, Inc. Securities Litig., 183 F.3d 542, 553 (6th Cir. 1999)).  However, the Sixth Circuit cautioned in PR Diamonds that, although "a strong inference of scienter cannot be drawn from speculative and conclusory allegations of GAAP violations …, some courts have recognized that an inference of knowledge or recklessness may be drawn from allegations of accounting violations that are so

simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant."  Id.  This Court will follow PR Diamonds.

Fourth, the Defendants argue that generalized imputations of knowledge based upon a defendant's corporate position are insufficient to raise a strong inference of scienter.  Doc. #24 at 19-20.  Once again, this Court agrees, in part. In PR Diamonds, the Sixth Circuit explained:

> Contrary to Plaintiffs' assertions, fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information.  As even the authorities which Plaintiffs cite indicate, the Complaint must allege specific facts or circumstances suggestive of their knowledge.  Without more, Plaintiffs fail to meet the PSLRA requirement to state with particularity facts giving rise to a strong inference of scienter.

364 F.3d at 688.  In accordance with PR Diamonds, therefore, this Court concludes that scienter cannot be inferred from the Defendants' positions in Huffy, alone.

Fifth, in their Amended Complaint, the Plaintiffs rely upon information provided to them by a number of confidential witnesses or informants to support their claims against the Defendants.  See Doc. #22 at ¶¶ 20-28 (identifying the confidential witnesses).  The Defendants argue that this Court may not consider those allegations, because the Plaintiffs have failed to identify those witnesses and their sources of information with specificity.  Doc. #24 at 20-22.  In Higginbotham v. Baxter Intern., Inc., 495 F.3d 753 (7th Cir. 2007), the Seventh Circuit discussed the role of information supplied by confidential or anonymous witnesses in satisfying the pleading requirements of the PSLRA:

> One upshot of the approach that Tellabs announced is that we must discount allegations that the complaint attributes to five "confidential witnesses"–one ex-employee of the Brazilian subsidiary, two ex-employees of Baxter's headquarters, and two consultants.  It is hard to see how

information from anonymous sources could be deemed "compelling" or how we could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist.

At oral argument, we asked when the identity of these five persons would be revealed and how their stories could be tested.  The answer we received was that the sources' identity would never be revealed, which means that their stories can't be checked.  Yet Tellabs requires judges to weigh the strength of plaintiffs' favored inference in comparison to other possible inferences; anonymity frustrates that process.

Not that anonymity is possible in the long run.  There is no "informer's privilege" in civil litigation.  Defendants are entitled to learn in discovery who has relevant evidence, and to obtain that evidence.  Indeed, plaintiffs are obliged by Fed.R.Civ.P. 26(a)(1)(A) to provide defendants with the names and addresses of all persons "likely to have discoverable information that the disclosing party may use to support its claims or defenses."  Concealing names at the complaint stage thus does not protect informers from disclosure (and the risk of retaliation); it does nothing but obstruct the judiciary's ability to implement the PSLRA.

This does not mean that plaintiffs must reveal all of their sources, as one circuit has required.  See In re Silicon Graphics Inc. Securities Litigation, 183 F.3d 970, 985 (9th Cir. 1999).  A complaint is not a discovery device.  Our point, rather, is that anonymity conceals information that is essential to the sort of comparative evaluation required by Tellabs.  To determine whether a "strong" inference of scienter has been established, the judiciary must evaluate what the complaint reveals and disregard what it conceals.

         *               *               *

It is possible to imagine situations in which statements by anonymous sources may corroborate or disambiguate evidence from disclosed sources.  Informants sometimes play this role in applications for search warrants.  Because it is impossible to anticipate all combinations of information that may be presented in the future, and because Tellabs instructs courts to evaluate the allegations in their entirety, we said above that allegations from "confidential witnesses" must be "discounted" rather than ignored.  Usually that discount will be steep.  It is unnecessary to say more today.

Id. at 756-57.  Accord, Frank v. Dana Corp., 525 F. Supp.2d 922, 931 (N.D.Ohio 2007); In re Proquest Securities Litig., 527 F. Supp.2d 728, 739-40 (E.D.Mich. 2007).  Contra Rosenbaum Capital, LLC v. McNulty, 2008 WL 619001 (N.D.Cal. 2008).

The Seventh Circuit revisited the issue of confidential or anonymous sources in its decision on remand from the Supreme Court in <u>Tellabs</u>.  <u>Makor Issues & Rights, Ltd. v. Tellabs, Inc.</u>, 513 F.3d 702 (7th Cir. 2008).  Therein, the Seventh Circuit distinguished the requirement it had adopted in <u>Higginbotham</u> six months earlier, writing:

> But that was a very different case from this one. The misconduct alleged [in <u>Higginbotham</u>] consisted of frauds committed by Baxter's Brazilian subsidiary, but because the suit was against the parent, the plaintiffs had to show that the parent knew about the Brazilian fraud.  The subsidiary had tried to conceal it from its parent as well as from the Brazilian government.  There was no basis other than the confidential sources, described merely as three ex-employees of Baxter and two consultants, for a strong inference that the subsidiary had failed to conceal the fraud from its parent and thus that the management of the parent had been aware of the fraud during the period covered by the complaint.
>
> The confidential sources listed in the complaint in this case, in contrast, are numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify, such as the returns of the 5500s, that sales of the 5500 were dropping off a cliff while the company pretended that demand was strong, that the 6500 was not approved by Regional Bell Operating Companies, that it was still in the beta stage and failing performance tests conducted by prospective customers, and that it was too bulky for customers' premises.  The information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources.  It would be better were the informants named in the complaint, because it would be easier to determine whether they had been in a good position to know the facts that the complaint says they learned.  But the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions.  <u>See</u> <u>In re Daou Systems, Inc.</u>, 411 F.3d 1006, 1015-16 (9th Cir. 2005); <u>California Public Employees' Retirement System v. Chubb Corp.</u>, 394 F.3d 126, 146-47 (3d Cir. 2004); <u>ABC Arbitrage Plaintiffs Group v. Tchuruk</u>, 291 F.3d 336, 353-54 (5th Cir. 2002); <u>Novak v. Kasaks</u>, 216 F.3d 300, 312-14 (2d Cir.2000).

<u>Id</u>. at 711-12.  The cases cited by the Seventh Circuit therein fully support its decision.  For instance, the Ninth Circuit requires that anonymous sources be

"described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." In re Daou Systems, Inc., 411 F.3d 1006, 1015 (9th Cir. 2005) (internal quotation marks and citation omitted). Accord Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir.2000) (same). In addition, the only District Court decision discussing both of those two Seventh Circuit decisions has the followed the approach adopted by that Circuit in its decision on remand in Tellabs. See In re Amgen, Inc. Securities Litig., 544 F. Supp.2d 1009 (C.D.Cal. 2008).

This Court agrees with the reasoning set forth and the result reached by the Seventh Circuit in Tellabs, on remand, and endorsed by the District Court in In re Amgen. Consequently, this Court will follow that result and reasoning herein. Therefore, when deciding whether to consider the statements attributed to confidential or anonymous witnesses in the Amended Complaint, as part of the calculus to be applied to determine whether the Plaintiffs have complied with the pleading requirements contained in the PSLRA, this Court will examine the descriptions of each of those individuals' jobs to ascertain whether any would have been in a position to have gained first hand knowledge of the facts attributed to him or her, and the detail of the information each is reported to have provided. In addition, the Court will consider whether the statements attributed to confidential witnesses have been corroborated.[26]

---

[26]In support of this contention, the Defendants have placed primary reliance upon In re Metawave Communications Corp. Securities Litig., 298 F. Supp.2d 1056 (W.D.Wash. 2003). According to Defendants, the Metawave court would require that complaint set forth the job title, specific dates of employment, responsibilities and basis of personal knowledge for each anonymous witness. Doc. #24 at 20. Herein, this Court will apply the standards discussed above, when deciding whether a statement attributed to a confidential informant satisfies the requirements of the PSLRA, rather than requiring a laundry list of allegations, which

C.  Application of Legal Standards to Allegations in Plaintiffs' Amended Complaint

Having addressed the Defendants' legal propositions, the Court now turns to their contention that the Plaintiffs' allegations do not raise a strong inference of scienter.  In particular, the Defendants argue:

> Plaintiffs do not (and cannot) allege that any Defendant received any concrete and personal benefit; consequently, Plaintiffs' allegations of scienter fail.  A complete review of the facts–and the inferences–demonstrates that Defendants disclosed bad news caused by an acquisition that did not work out as they had hoped.  Plaintiffs' allegations that Defendants failed to perform adequate due diligence of Gen-X ignores (and, tellingly, actually conceals) facts showing that the opposite was true: Huffy hired the professionals at KPMG to complete the due diligence.  The allegations relating to purported "red-flags" also fail to raise a strong inference of scienter because Plaintiffs' allegations are vague and conclusory.  The purported GAAP violations and restatement are not enough to establish a strong inference of scienter.  Finally, none of the Helwig factors are present.

Doc. #24 at 23.  As a means of analysis, the Court will address each of the Defendants' six assertions in the order set forth above.  However, given that the Supreme Court in Tellabs instructed courts that the focus of their inquiry is on "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard" (127 S.Ct. at 2509 (emphasis in the original)), this Court will not consider, in isolation, whether any of the Defendants' six assertions demonstrates that the Plaintiffs have not adequately plead scienter.  Rather, after addressing each of those assertions, the Court will then turn to the question of whether Plaintiffs have met the pleading requirements of the PSLRA, as interpreted in Tellabs.

---

are not expressly required by that statute.

1.  Concrete and Personal Benefit

In the Amended Complaint, the Plaintiffs allege that the Defendants were motivated to inflate Huffy's financial results by highly lucrative bonuses, directly contingent upon its earnings per share ("EPS"), return on net assets ("RONA") and total shareholder return ("TSR").  Doc. #22 at ¶ 238.  According to Plaintiffs, EPS and RONA were increased in 2003, as a result of falsely reporting the value of the intangible assets acquired from Gen-X, and TSR was increased as a result of the acquisition of Gen-X.  Id.  In addition, the Plaintiffs allege that Huffy's compensation policies for officers included annual and long-term incentive plans. Id at ¶ 239.  Plaintiffs also describe those plans and allege what each of the Defendants was entitled to receive in 2003, which they (Plaintiffs) contend demonstrated that each of the Defendants had an incentive to push through the merger with Gen-X and to inflate Huffy's results.  Id. at ¶¶ 240-245.

The Defendants argue that those allegations are not sufficient to raise a strong inference of incentive, because the Plaintiff have not and cannot allege that they have received any concrete and personal benefit, as a result of the merger and the alleged inflation of Huffy's results and the value of its shares of stock.  In support of that assertion, the Defendants point out the Plaintiffs' failure to allege that any one or more or all of them (the Defendants) received a bonus in 2003 in accordance with those plans.  While this Court cannot consider in isolation the Plaintiffs' allegations concerning the Defendants' incentive to accomplish the Gen-X merger and to inflate Huffy's results, it will take into account the absence of an allegation that one or more or all of the Defendants received a bonus when it factors the allegations of incentive into the calculus of scienter viewed through the prism of the PSLRA.  However, courts have rejected the premise that the existence

of an incentive compensation plan alone is sufficient to establish scienter.  Kalnit v.
Eichler, 264 F.3d 131, 140 (2d Cir. 2001) (in the course of concluding that
plaintiffs had failed to allege scienter, noting that "incentive compensation can
hardly be the basis on which an allegation of fraud is predicated," given the
ubiquitousness of such compensation) (internal quotation marks and citation
omitted); Acito v. IMCERA Group, Inc., 47 F.3d 47, (2d Cir. 1995) (same);
Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1069 (5th Cir. 1994)
(same); Morse v. McWhorter, 200 F. Supp.2d 853, 898 (M.D.Tenn. 2000)
(same).[27]  For this reason, this Court will discount the Plaintiffs' allegations
concerning the incentive plans when it determines whether they have met the
burden imposed upon them by the PSLRA of pleading scienter.

The Plaintiffs also allege that Defendants were motived to inflate Huffy's
financial results and the value of the assets acquired from Gen-X, in order to
satisfy the expectations of Wall Street and to avoid violating Huffy's debt
covenants.  See Doc. #22 at ¶¶ 108(d), 130(g), 140(g), 149(f), 159(h) and
175(h).  The Defendants argue that these allegations are not sufficient to raise a
strong inference of scienter, because all corporate officers and directors share the
same motives.  This Court agrees with Defendants that all corporate officers and
directors want to ensure that the corporations for which they work meet or exceed

_____

[27]In that decision, the Morse court dismissed the plaintiffs' securities fraud claims,
for failure to comply with the heightened pleading standards established by the
PSLRA.  The District Court subsequently denied plaintiffs' motion to alter judgment
in order to file an amended complaint.  The Sixth Circuit vacated that latter
decision and remanded the matter to permit the filing of an amended complaint,
without addressing the propriety of the dismissal of the plaintiffs' initial complaint.
Morse v. McWhorter, 290 F.3d 795 (6th Cir. 2002).  Therefore, the decision of the
Sixth Circuit in that litigation did not impact the proposition for which this Court
has cited the District Court decision.

expectations and do not violate debt covenants.  See In re Cross Media Mktg.

Corp. Securities Litig., 314 F. Supp.2d 256, 264 (S.D.N.Y. 2004).  Therefore, as it

did with the incentive plans, this Court will discount Plaintiffs' allegations

concerning Wall Street's expectations and Huffy's debt covenants when it

determines whether they have met the burden imposed upon them by the PSLRA

of pleading scienter.

In addition, as is discussed above, the Trustee alleged in the complaint, filed

in Huffy's bankruptcy proceeding, that Huffy's directors cooperated with Graber

and provided him a cash payment of nearly $2.7 million under Huffy's

Supplemental Executive Retirement Plan, in February, 2004.  In considering

whether the Plaintiffs have alleged scienter in accordance with the requirements of

the PSLRA, as interpreted by the Supreme Court in Tellabs, this Court will consider

that allegation as if it had been set forth in the Amended Complaint.  In particular,

this Court will consider that allegation as containing the assertion that Graber

obtained a concrete and personal benefit in the form of the payment of

approximately $2.7 million, which would not have been available to him, had the

truth of Huffy's financial condition been known.[28]

2.  Due Diligence

One of the allegedly materially false statements upon which Plaintiffs base

this litigation is "the 'extensive due diligence' purportedly performed by defendants

_____

[28]The Defendants argue that the Trustee's allegation in that regard is not sufficient
to raise a strong inference of scienter.  See Doc. #45 at 13-15.  This Court agrees
that, in and of itself, that allegation does not raise such an inference.  However, it
is proper to consider such, when the Court considers all the facts collectively, as
required by the Supreme Court in Tellabs.

prior to the acquisition of Gen-X." See Doc. #22 at ¶ 89. See also Id. at

¶¶ 94(c), 95-96, 100, 106(c), 108(a)-(c), 118(f), 130(f) and 140(f).  The

Defendants argue that the Plaintiffs' allegations in that regard are insufficient to

raise a strong inference of scienter.  Defendants base this assertion on one of the

sources of misstatements relied upon by Plaintiffs in tn the Amended Complaint, to

wit: Huffy's S-4 Registration Statement, filed on July 5, 2002, and Amended S-4

Registration Statement, filed on July 29, 2002, setting forth information

concerning the merger between Huffy and Gen-X and recommending that

shareholders approve that merger.  See Doc. #22 at ¶¶ 97-100.  The Defendants

argue that the S-4 Registration Statement and Amended S-4 Registration

Statement demonstrate that Huffy conducted due diligence on its acquisition of

Gen-X before the merger, given that those documents point out that Huffy retained

both the accounting firm of KPMG and the investment firm of A.G. Edwards for

that purpose.[29]  This Court will certainly consider the fact that Huffy retained those

_____

[29]Authenticated copies of the S-4 Registration Statement and Amended S-4
Registration Statement are attached to Defendants' Motion to Dismiss (Doc. #24).
The Plaintiffs argue that the Court cannot consider Huffy's S-4 Registration
Statement and Amended S-4 Registration Statement for the truth of the matters
set forth therein.  Doc. #28 at 8-9.  Certainly, this Court could not, on the basis of
the statements set forth in those filings, conclude that the Defendants
conducted adequate due diligence and that, therefore, Defendants' statements about due
diligence in other filings with the SEC were not false.  However, this Court is now
determining whether the Plaintiffs have plead "with particularity facts giving rise to
a strong inference that the defendant acted with the required state of mind," as
required by the PSLRA.  The Supreme Court explained in Tellabs that, in making
such a determination, courts must consider competing inferences and decide
whether "an inference of scienter must be more than merely plausible or
reasonable-it must be cogent and at least as compelling as any opposing inference
of nonfraudulent intent" and that courts should consider materials, such as Huffy's
S-4 Registration Statement and Amended S-4 Registration Statement, which
Plaintiffs referred to in their Amended Complaint.  127 S.Ct. at 2504-05 and
2509.  Therefore, it is appropriate to consider the statements in those filings,
concerning KPMG and A.G. Edwards, when deciding whether the inference of

two entities when it determines whether Plaintiffs have adequately plead scienter. However, merely because the S-4 Registration Statements mention that those firms were retained does not establish, in and of itself, that "extensive due diligence" was conducted.

3.  Red Flags

Defendants point to a number Plaintiffs' allegations, in which they contend the "Defendants' individual participation" in meetings and the like, as well as "prior dealings" between the companies, warned them about or alerted them to problems with Gen-X or they were reckless in failing to investigate such problems that had been brought to their attention.[30]  See Doc. #22 at ¶¶ 108(a)-(b), 118(f), 130(f) and 140(f).  Defendants contend that those statements do not raise a strong inference of scienter under the PSLRA, because the Plaintiffs have neglected to include details concerning those meetings, such as when the meetings occurred or what became known as a result of those dealings.  For a more fundamental reason, this Court will not consider the allegations in those paragraphs when it decides whether Plaintiffs have adequately plead scienter.  This Court has concluded above that the group pleading doctrine did not survive the passage of the PSLRA.  As a consequence, this Court will not consider Plaintiffs' allegations concerning red

_____

scienter that the Plaintiffs would have the Court draw from the allegations in their Amended Complaint is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."

[30]The Sixth Circuit has described such warning signs as "red flags," explaining that "[s]pecific factual allegations that a defendant ignored red flags, or warning signs that would have revealed the accounting errors prior to their inclusion in public statements, may support a strong inference of scienter."  PR Diamonds, 364 F.3d at 686.

flags, when deciding whether the Plaintiffs' Amended Complaint complies with the pleading standards adopted by the statute, since, in the main, those allegations refer to the Defendants generally.  See Southland Securities Corp., 365 F.3d at 365 (holding that, "[c]onsistent with our rejection of the 'group pleading' doctrine, we do not construe allegations contained in the Complaint against the "defendants" as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded").

Under the rubric of red flags, the Defendants also argue that the allegations set forth in ¶¶ 45 and 47 of the Amended Complaint do not raise a strong inference of scienter.  The Court discusses those allegations separately, since they relate to a particular Defendant.  In ¶ 45, Plaintiffs allege that, although a confidential witness, identified as CW-8, would have been the person to conduct due diligence concerning Gen-X's accounts receivable and payable, he or she was not requested to examine Gen-X's accounts receivable until late 2002, after the merger had been consummated.  In ¶ 47, the Plaintiffs contend that, during the due diligence process, a confidential witness, identified as CW-7, was told by Lafferty to review two boxes of documents relating to Gen-X's business and to provide an analysis of them.  CW-7 told Lafferty that the documents were outdated and incomplete and provided a list of questions and concerns that needed to be addressed before due diligence could be completed.  Lafferty did not respond to that note and told CW-7 to let it go when the latter attempted to follow up. This Court will consider these allegations when it engages in the calculus mandated by the Supreme Court in Tellabs, to the extent appropriate under the Seventh

Circuit's decision in that case on remand, addressing the use of confidential witnesses.

### 4.  Access to Information

The Defendants argue that the Plaintiffs' allegations that they (Defendants) had access to material information (see Doc. #22 at ¶¶ 94(e), 108(f), 118(h), 130(h), 140(h), 149(g), 159(i) and 175(i)) do not raise a strong inference of scienter.  In PR Diamonds, the Sixth Circuit held that "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information."  364 F.3d at 688.  While this Court will not conclude that the Plaintiffs have met their pleading burden under the PSLRA, merely as a result of their allegations concerning access to information, it will consider those allegations, as directed by the Supreme Court in Tellabs, when answering that question.

### 5.  Violations of GAAP and Restatements of Financial Results

The Defendants point out that the Amended Complaint contains extensive allegations concerning asserted violations of GAAP.  See Doc. #22 at ¶¶ 188-236.  The Defendants argue that those allegations are insufficient to raise a strong inference of scienter.  In support of that proposition, the Defendants rely upon Comshare, wherein the Sixth Circuit held that "[t]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." 183 F.3d at 553 (internal citations omitted).  This Court will, of course, follow that mandatory authority; however, there is no language in Comshare which would indicate that this Court may not consider violations of GAAP, inter alia, when deciding whether the plaintiff

has met its obligation of pleading scienter in accordance with the standards set

forth in the PSLRA.


6.  Helwig Factors

The Defendants argue that the Plaintiffs' failure to allege that any of the

Helwig factors exist is a striking indication of why they have failed to allege

scienter in the manner required by the PSLRA.  Doc. #24 at 30-32.  In contrast,

the Plaintiffs argue that a number of the Helwig factors are present herein:

> divergence between internal reports and external statements on the same
> subject; closeness in time of an allegedly fraudulent statement or omission
> and the later disclosure of inconsistent information; disregard of the most
> current factual information before making statements; disclosure of
> accounting information in such a way that its negative implications could
> only be understood by someone with a high degree of sophistication; and,
> the self-interested motivation of defendants in the form of saving their
> salaries or jobs.

Doc. #28 at 10.  Those are the second, third, sixth and eighth Helwig factors.  See

Earthboard Sports, 481 F.3d at 917.  This Court will consider those matters when

it engages in the analysis required by the Supreme Court's decision in Tellabs.


D.  Application of Tellabs

As is indicated above, the Supreme Court held in Tellabs that, in determining

whether a plaintiff has met its burden of alleging "with particularity facts giving

rise to a strong inference that the defendant acted with the required state of

mind," as required by the PSLRA, courts must consider competing inferences and

that "an inference of scienter must be more than merely plausible or reasonable–it

must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  127 S.Ct. at 2504-05.

According to the Plaintiffs, the Defendants issued materially false and misleading statements during the class period, concerning:

> (1) the "extensive due diligence" purportedly performed by defendants prior to the acquisition of Gen-X; (2) the value of the assets acquired from Gen-X; (3) the performance of Gen-X after the acquisition and its impact on Huffy's financial results; and (4) Huffy's financial results and condition, and its future prospects for profitability.

Doc. #22 at ¶ 89.  The Court now turns to the question of whether, applying Tellabs to the allegations in the Amended Complaint, the Plaintiffs have set forth a cogent inference of scienter in their Amended Complaint, which is at least as compelling as the competing inference of non-fraudulent intent.

However, before engaging in that analysis, the Court will briefly state why the evidence does not raise a genuine issue of material fact as to whether D'Aloia acted with scienter, prior to December 2, 2003.  While Plaintiffs allege that D'Aloia participated in a conference call on the date, see Doc. #22 at ¶¶ 17 and 161, they do not attribute any allegedly fraudulent statement to him beforehand.  Simply stated, one can not make a statement with scienter or fraudulent intent, if he does not make a statement.  Moreover, since this Court has concluded, above, that the group pleading doctrine did not survive the passage of the PSLRA, the Court cannot accept Plaintiffs argument (see Doc. #28 at 81-82) that D'Aloia can be held liable for statements prior to December 2, 2003, given that, from August, 2003, forward he had devoted the majority of his time to problems with Gen-X.  Although that activity may have given him significant insight into the problems facing Gen-X, he can be held liable herein only for his fraudulent statements.  Since he made no

statements before December 2, 2003, upon which the Plaintiffs base this litigation, he cannot be liable for any allegedly fraudulent statement before that date.

Turning to the issue of due diligence, the Court concludes, for reasons which follow, that the Plaintiffs have failed to allege a cogent inference of scienter concerning that category of alleged misstatements in their Amended Complaint, an inference of same which is at least as compelling as the competing inference of non-fraudulent intent.  As the Plaintiffs point out in the Amended Complaint, when Huffy announced the acquisition of Gen-X, it also indicated that "extensive due diligence" had been conducted.  See e.g., Doc. #22 at ¶ 43.  The allegations set forth in the Plaintiffs' pleading certainly raise an inference that this statement was false; however, whether Graber, Lafferty and/or Howard acted with knowledge or recklessly at that point is another question.  In assessing the adequacy of the Plaintiffs' allegations on this point, it bears emphasis that this allegedly false statement was made in Huffy's press release of June 17, 2002, which also announced the agreement to acquire Gen-X.  For any of those Defendants to have made that statement knowing it to be false, one would have to assume that they intentionally caused Huffy to acquire Gen-X without conducting the requisite due diligence.  In addition, Huffy retained two entities to assist in conducting due diligence.  Considering that, in the mix of all information relevant to due diligence, this Court concludes that an inference that any one or more or all of those three Defendants acted knowingly is not as compelling as the competing inference that they may have been negligent.  For similar reasons, this Court cannot conclude that, with respect to the statement that "extensive due diligence" had been conducted, any of those Defendants was reckless, i.e., engaged in "highly unreasonable conduct which is an extreme departure from the standards of

ordinary care."  PR Diamonds, 364 F.3d at 681 (internal quotation marks and citation omitted).  Accordingly, the Court concludes that the Plaintiffs have failed to meet the requirement of pleading scienter, imposed by the PSLRA, with respect to the allegation that the Defendants falsely indicated that "extensive due diligence" was conducted before the acquisition of Gen-X.

With respect to the other three categories of allegedly false statements (the value of the assets acquired from Gen-X; the performance of Gen-X after the acquisition and its impact on Huffy's financial results; and Huffy's financial results and condition, and its future prospects for profitability), this Court is of the opinion that the inference of scienter is as compelling as that of non-fraudulent intent.[31] As an initial matter, the Court notes that each of the Defendants had access to Huffy's financial information as a result their positions.  Indeed, D'Aloia is alleged to have spent a substantial portion of his time on Gen-X, from August, 2003, forward.  In addition, Huffy conceded in its bankruptcy filing that it had become aware of Gen-X's mounting losses soon after the acquisition had been completed. Indeed, the statements set forth in Huffy's bankruptcy filing are fully supported by a number of the confidential witnesses or informants relied upon by the Plaintiff in their Amended Complaint.  See Doc. #22 at ¶¶ 49-51.[32]  Before Huffy's results for the Third Quarter of Fiscal Year 2002 were announced, Huffy had been investigating Gen-X's problems with accounts receivable and payable, without a

---

[31]Of course, with respect to D'Aloia, this conclusion does not apply to any statements made before December 2, 2003.

[32]The Plaintiffs' allegations demonstrate that the confidential witnesses providing this information, numbered 2, 4, 7 and 8, had sufficient contact with Huffy's management decision making and the Defendants to have acquired the information attributed to them (the confidential witnesses).  Doc. #22 at ¶¶ 21, 23, 26 and 27.

satisfactory resolution, yet the Gen-X acquisition continued to be trumpeted as a success.  Moreover, the Plaintiffs allege that many of the alleged falsehoods impact upon core financial transactions.  Id. at ¶¶ 257-259.  Courts have held that the more central a fact is to a company's core operations the more likely its executive acted with scienter.  In re Ancor Communs., 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) ("Facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers.") (internal quotation marks and citation omitted).  See also Greebel v. FTP Software, Inc., 194 F.3d 185, 206 n.18 (1st Cir. 1999) (noting that "[p]roblems with a transaction with a major impact on revenues are more likely to help support a strong evidence of scienter").


III.  Loss Causation

As the Defendants assert (see Doc. #24 at 33), the PSLRA requires that plaintiffs prove that the alleged securities fraud caused their economic loss.  The term "loss causation" is defined by § 21D(b)(4) of that statute, which provides:

> (4) Loss causation
> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4).  In Earthboard Sports, the Sixth Circuit explained the element of loss causation in private securities fraud actions:

> In a private securities fraud action, a plaintiff must prove all "traditional elements of causation and loss" including "that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  Dura Pharmaceuticals, 544 U.S. at 345.  Loss causation requires "a causal connection between the material

misrepresentation and the loss." Id. at 342.  It has been likened to
proximate cause in tort law.  AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d
202, 213 (2d Cir. 2000).

481 F.3d at 920.  In Dura Pharmaceuticals, the Supreme Court concluded that

merely alleging that the defendant's misrepresentations caused the price which

plaintiffs paid to purchase shares of defendants stock to be artificially inflated and

that they (plaintiffs) had suffered a loss as a result did not sufficiently allege the

element of loss causation.  544 U.S. at 346-47.  The Court explained:

> We concede that ordinary pleading rules are not meant to impose a
> great burden upon a plaintiff.  Swierkiewicz v. Sorema N. A., 534 U.S. 506,
> 513-515 (2002).  But it should not prove burdensome for a plaintiff who has
> suffered an economic loss to provide a defendant with some indication of
> the loss and the causal connection that the plaintiff has in mind.

Id. at 347.  See also Id. at 346 (noting that the PSLRA "makes clear Congress'

intent to permit private securities fraud actions for recovery where, but only where,

plaintiffs adequately allege and prove the traditional elements of causation and

loss").  Therein, the Supreme Court held that proof that the defendants'

misrepresentations caused plaintiffs to purchase stock at an inflated price, alone,

would not establish the element of loss causation and that, therefore, alleging

same was not sufficient to state a claim for relief.

Plaintiffs' theory of loss causation is set forth in ¶¶ 262-267 of their

Amended Complaint (Doc. #22).  Therein, the Plaintiffs allege that the Defendants'

false and misleading statements caused the value of Huffy's shares of stock to

become artificially inflated, Doc. #22 at ¶ 262, pointing to seven such statements,

to wit: 1) the 9.16% increase in the value of Huffy's stock on April 16, 2002,

after news of Huffy's earnings for the First Quarter of Fiscal Year 2002 had been

released;[33] 2) the 13.25% increase in the value of Huffy's stock on June 18, 2002, one day after news of Gen-X merger had been announced; 3) the 4.11% increase in the value of Huffy's stock on July 17, 2002, one day after a Huffy press release reporting that the Gen-X merger was on schedule and that sales and earnings for the Second Quarter of Fiscal Year 2002 were excellent; 4) the 11.72% increase in the value of Huffy's stock on September 30, 2002, one day after the closing of the Gen-X merger had been announced; 5) the 3.64% increase in the value of Huffy's stock on November 14, 2002, one day after the release of Huffy's results for the Third Quarter of Fiscal Year 2002 had become public; 6) the 4.64% increase in the value of Huffy's stock on July 16, 2003, after Huffy's results for the Second Quarter of Fiscal Year 2003 had been announced; and 7) the 1.17% increase in the value of Huffy's stock on October 16, 2002, one day after a press release had been issued announcing financial results for the Third Quarter of Fiscal Year 2003. Id. at ¶ 263. According to the Plaintiffs, but for the foregoing fraudulent statements, they and the class they seek to represent would not have purchased shares of Huffy stock. Id. at ¶ 264. In addition, the Plaintiffs have detailed eleven statements by the Defendants, containing negative news about Huffy,[34] which caused the value of their shares of Huffy to decrease,

---

[33]In ¶ 263(a) of the Amended Complaint, the Plaintiffs allege that the news, which caused Huffy's stock to increase in value on April 16th, related to the second quarter of Fiscal Year 2002. That allegation, however, contradicts other allegations in that pleading which indicate that the statements made that date relate to the First Quarter of that Fiscal Year, and that statements made on July 16, 2002, relate to that year's Second Quarter. See Doc. #22 at ¶¶ 90-94, 101-108 and 263(c). Therefore, this Court concludes the reference to the Second Quarter of Fiscal Year 2002 in ¶ 263(a) was a typographical error.

[34]The Plaintiffs do not contend that the eleven statements containing negative news are actionable, fraudulent statements. Rather, they contend that the negative news demonstrates that statements previously made by the Defendants,

causing them to lose millions.  Id. at ¶¶ 265-266.  The Plaintiffs summarize their

theories of loss causation and damages in the following manner:

> As a direct result of defendants' false and misleading material
> statements and omissions, which caused the artificial inflation of stock
> prices, and as the further result of the decline in stock prices which followed
> as the truth became more fully revealed, Plaintiffs and members of the
> proposed class suffered damages of at least $40 million.

Id. at ¶ 267.

Defendants contend that the Plaintiffs have failed to adequately plead the

element of loss causation, because any purported loss suffered by Huffy was the

direct result of the tumultuous economic environment during the class period and

non-fraudulent bad news that was occurring simultaneously.  Although that

argument, supported by proper evidence, may demonstrate that Defendants are

entitled to summary judgment on this issue, should this lawsuit proceed to that

stage, it does not cause this Court to conclude that the Plaintiffs have failed to

plead the element of loss causation.  On the contrary, they have set forth their

theory of loss causation in detail, and that theory is based on more than the bare

assertion that the Defendants' alleged misrepresentations merely caused the value

of Huffy's stock to become inflated.  Accord Ross v. Abercrombie & Fitch Co.,

501 F. Supp.2d 1102, 1118-19 (S.D.Ohio 2007) (holding that plaintiffs'

allegations of loss causation complied with Dura, because they asserted that

defendants' misrepresentations had caused the value of the shares of stock to

become inflated, after which the disclosure of the true state of affairs caused the

plaintiffs to lose millions of dollars).  It bears emphasis, that, in ruling on a motion

---

which are alleged to have fraudulently concealed the negative news, caused them
to suffer an economic loss, because Huffy's stock lost value when the negative
news was announced.

to dismiss under Rule 12(b)(6), this Court must accept the plaintiffs' allegations as true.  Bredesen, 500 F.3d at 527.[35]

Based upon the foregoing, this Court rejects the Defendants' assertion that the Plaintiffs have failed to allege, in adequate fashion, the element of loss causation.  Accordingly, it overrules the Defendants' Motion to Dismiss (Doc. #24), to the extent that it is based upon that assertion.

IV.  Falsity/Materiality

"A statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it."  In re Nice Systems, Ltd. Securities Litig., 135 F. Supp.2d 551, 573 (D.N.J. 2001) (internal quotation marks and citation omitted).  As is indicated above, under the heightened pleading standards set forth in the PSLRA, a plaintiff's complaint "must 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'"  Fidel v. Farley, 392 F.3d 220, 227 (6th Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(1)).

In Basic, Inc. v. Levinson, 485 U.S. 224 (1988), the Supreme Court defined the requirement of materiality in an action, such as the instant litigation, under § 10(b) and Rule 10b-5:

---

[35]Defendants base their contention that the Plaintiffs have failed to plead the element of loss causation, in part, on press releases which this Court has concluded above that it cannot consider.  In essence, the Defendants argue that those documents demonstrate that the Plaintiffs' allegations of loss causation lack evidentiary support.  Although the PSLRA permits a defendant to challenge the sufficiency of a plaintiff's securities fraud complaint, without being required to bear the burden and expense of discovery (see 15 U.S.C. § 78u-4(b)(3)(b)), that statute does not authorize a defendant to seek summary judgment, without the plaintiff being afforded the opportunity of conducting discovery.

> The Court also explicitly has defined a standard of materiality under the securities laws, see TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976), concluding in the proxy-solicitation context that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." Id., at 449. Acknowledging that certain information concerning corporate developments could well be of "dubious significance," id., at 448, the Court was careful not to set too low a standard of materiality; it was concerned that a minimal standard might bring an overabundance of information within its reach, and lead management "simply to bury the shareholders in an avalanche of trivial information-a result that is hardly conducive to informed decisionmaking." Id., at 448-449. It further explained that to fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id., at 449. We now expressly adopt the TSC Industries standard of materiality for the § 10(b) and Rule 10b-5 context.

Id. at 231-32 (footnotes omitted).[36] See also Id. at 240 (reiterating that "[a]s we clarify today, materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information"). Whether a particular statement is material constitutes a fact-specific inquiry. Id. See also Helwig, 251 F.3d at 555. In re Ford Motor Co. Securities Litig., 381 F.3d 563 (6th Cir. 2004), the Sixth Circuit discussed the instances in which a complaint may be dismissed, because the plaintiff have failed to allege that the misstatements, upon which the litigation is predicated, were material:

> We may properly dismiss a complaint on the ground that the alleged misrepresentations or omissions are immaterial only if "they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." Helwig, 251 F.3d at 563 (internal quotation marks, citation and emphasis omitted). "Immaterial statements include vague, soft, puffing statements or obvious hyperbole" upon which a reasonable investor would not rely. In re K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 897 (8th Cir. 2002). Statements that are "mere puffing" or

---

[36]In one of those omitted footnotes, the Basic Court explained that TSC Industries had arisen under § 14(a) of the Exchange Act. See 485 U.S. at 231 n. 7.

"corporate optimism" may be forward-looking or "generalized statements of optimism that are not capable of objective verification." Grossman v. Novell, Inc., 120 F.3d 1112,1119 (10th Cir. 1997).

Id. at 570.[37]

The Defendants argue that the following Plaintiffs' allegations, which they (Plaintiffs) contend were untrue, cannot support the claims set forth in this litigation, because they were accurate at the time they were made:

> (1) Defendants inadequately disclosed the purported problems with Gen-X's accounts receivable ("A/R"), accounts payable ("A/P") and inventory reserves; (2) Defendants did not sufficiently attribute Huffy's increase in administrative expenses to Gen-X; (3) Defendants' disclosures regarding Huffy's debt and ability to meet debt covenants were misleading; (4) Defendants' statements regarding the due diligence and accretive benefits of the Gen-X merger were misleading; (5) Defendants did not adequately apprise the public of the closing date of Huffy's merger with Gen-X; (6) Defendants did not disclose Huffy's problems with Gen-X soon enough; (7) Defendants permitted Huffy to violate GAAP; and (8) Defendants recklessly signed Sarbanes-Oxley certifications.

Doc. #24 at 44.  As have the Defendants, the Court addresses those arguments in the order presented.


1.  Accounts Receivable, Accounts Payable and Inventory Reserves

The Plaintiffs have repeatedly alleged in the Amended Complaint that the Defendants failed to disclose problems with Gen-X's accounts receivable, accounts payable and inventory reserves.  See Doc. #22 at ¶¶ 100, 106(a), 117(c), 129(a),

---

[37]The Defendants argue that many of their statements that are alleged to have been false are not actionable, because they are forward-looking statements, protected by the safe harbor provision added the PSLRA, 15 U.S.C. § 78u-5.  See Doc. #24 at 42-44.  The Court addresses the Defendants' arguments concerning the safe harbor, in the context of specific allegations in the Plaintiffs' Amended Complaint, which the Defendants contend are so immunized.

129(c), 129(d), 139(a), 139(d), 139(f), 148(a), 148(d), 148(f), 158(a), 158(f), 162, 174(e)-(f) and 213.[38]  According the that pleading, the Defendants' failure in that regard has rendered a number of their statements materially false and misleading.  Those allegedly false and misleading statements are set forth in ¶¶ 99, 104, 119, 134, 141, 143, 147, 151, 152, 155 and 169 of the Amended Complaint (Doc. #22).  In those paragraphs, the Plaintiffs alleged:

1.  That Graber, Howard and Lafferty encouraged shareholders to vote in favor of the merger with Gen-X, in the Amended S-4 Registration Statement, by misstating that there may be an increased potential for growth, because of Huffy's post-merger superior asset base, portfolio of growth opportunities, operating skills, financial stability, strength and opportunity for cost savings, and the financial performance and condition and prospects of Gen-X and Huffy (¶ 99);

2.  That Graber misstated, during a conference call conducted on July 16, 2002, that Huffy is good at cost control and focuses on it very intently, that Gen-X continued to track its forecasts and would probably have more than $150 million in sales for the year and that Gen-X was a good acquisition, because it will be instantly accretive (¶ 104);

3.  That Graber misstated, in a January 9, 2003, press release, that Huffy was pleased with its sales growth for the Fourth Quarter of Fiscal Year 2002, which was driven primarily by the acquisitions completed earlier in 2002; that increased freight charges and the like, incurred as a result of a West Coast dock lockout, would decrease earnings $0.07 per share from earlier estimates; that he was

---

[38]With these allegations, the Plaintiffs have attempted to satisfy the requirement, contained in § 78u-4(b)(1), that "the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."

excited about Huffy's prospects for Fiscal Year 2003; that the acquisition of Gen-X has helped create a stronger platform for growth, helped diversify customer base and set the stage for the future; and that due to the political and economic retail environment it was prudent to be conservative in guidance (¶ 119);

4.  That Lafferty misstated, during a conference call commenting on First Quarter results conducted on April 16, 2003, that Huffy's accounts receivable were up $28 million from the first quarter of the previous year and that most of that increase was attributable to the acquisition of Gen-X (¶ 134);

5.  That a press release issued by Huffy on July 15, 2003, announcing financial results for the Second Quarter of Fiscal Year 2003, misstated that Huffy's increased sales were driven by the acquisition of Gen-X and that Huffy continued to be pleased with improvements of margins (¶ 141);

6.  That Huffy misstated, in its 10-Q Report for the Second Quarter of Fiscal Year 2003, that its increases in gross sales and gross profits were as a result of the acquisition of Gen-X (¶ 143);

7.  That, during a conference call conducted on July 16, 2003, regarding Huffy's results for the Second Quarter of Fiscal Year 2003, Lafferty misstated that gross margins were up because of the product mix, with a higher percentage of higher-margin sales coming from Gen-X (¶ 147);

8.  That in a press release Huffy issued on October 15, 2003, announcing financial results for the Third Quarter of Fiscal Year 2003, Graber misstated that margins for the Third Quarter were down slightly when compared to previous quarters and last year as a result of softness in the blackboard business, slippage of sales of snowboards and overall lower than expected sales in action sports and the opportunity business; that, despite lower sales and margin pressure, earnings were

as forecast as a result of a continuing focus on cost containment; that sales for the year were anticipated to be in the $450 to $460 million range, with earnings from continuing operations $0.34 to $0.38 per share and net income $0.44 to $0.48 per share; and that the difficult Third Quarter had included several one-time items (¶ 151);

9.  That, during a conference call conducted on October 16, 2003, also discussing the financial results for the Third Quarter, Graber misstated that Huffy was a little higher on working capital in Gen-X than management would have liked; that the majority of sales growth that occurred during the Third Quarter was as a result of Gen-X which had solid sales; and that management thought that Huffy was going to have a strong Fourth Quarter (¶ 152);

10.  That Huffy misstated in its 10-Q Report for the Third Quarter of Fiscal Year 2003 that its increased sales over that period for the previous year were due to the acquisition of Gen-X, since the businesses it had owned before the acquisition suffered lower sales as a result of Kmart's bankruptcy and poor economic conditions; and that the primary reason for the increased gross profit for the Third Quarter was the addition of Gen-X (¶ 155); and

11.  That, during a conference call conducted on February 17, 2004, to discuss results for the Fourth Quarter and all of Fiscal Year 2003, D'Aloia and Lafferty falsely attempted to assure investors that Huffy's problems were being resolved, with the former misstating that Gen-X snowboard and golf lines finished the year with solid earnings and strong revenue growth, while the latter announced that Huffy had recorded several charges to income that adversely impacted gross margin, many of which were taken in relationship to Gen-X, in order to adjust reserves to a more conservative level (¶ 169).

First, Defendants argue that, in certain of the paragraphs numbered by the Court above on pages 56 through 58 (3, 4, 6 (in part), 7, 8, 10 and 11, which include the allegations set forth in ¶¶ 119, 134, 143 (in part), 147, 151, 155 and 169 of the Amended Complaint)), the Plaintiffs rely upon allegedly misleading rather than false statements and that those statements were not misleading, given that Huffy's S-4 Registration Statement and Amended S-4 Registration Statement indicated that the merger with Gen-X and investments in Huffy common stock involved a high degree of risk, that Huffy might fail to realize the anticipated benefits of the merger and that intense competition in the sporting goods industry could limit the growth of Huffy and/or Gen-X and reduce their profitability.  This Court rejects Defendants' argument that Huffy's generalized warnings about the types of risks which typically confront investors in most businesses are not actionable, because those warnings do not address the Plaintiffs' specific allegations concerning misstatements that inflated Gen-X's positive contributions to Huffy and diminished the impact of increased accounts receivable that were attributable to the acquisition of Gen-X.

Second, Defendants argue that the statements set forth in certain of the paragraphs numbered by the Court above on pages 56 through 58 (1-3, 5, 6 (in part), 7, 9 and 10 (in part)), are not actionable, because they are no more than vague statements of corporate optimism.[39]  In support of that argument,

---

[39]The Defendants also contend that the statements set forth in the paragraphs numbered by the Court above on pages 56 through 58 (1 and 2), are not actionable, because they are forward-looking statements under the PSLRA.  See Doc. #24 at 48.  Although the Court agrees with the Defendants that, in the main, the statements relied upon by Plaintiffs in ¶¶ 99 and 104 of the Amended Complaint (Doc. #22) look to the future, this Court cannot conclude that those allegations are not actionable as a result.  As is indicated above, the PSLRA contains a safe harbor provision for forward-looking statements.  Although that

Defendants rely upon Albert Fadem Trust v. American Elec. Power, Inc., 334 F. Supp.2d 985, 1026-27 (S.D. Ohio 2004), wherein Judge Algernon Marbley held that soft statements which were nothing more than puffery are immaterial.  See also, Zaluski v. United American Healthcare Corp., 527 F.3d 564 (6th Cir. 2008) (affirming dismissal of securities fraud claim under Rule 10b-5, because alleged misstatements were mere puffery, rather than being material).  In support of his decision in Albert Fadem Trust, Judge Marbley quoted the following passage from the decision of the Fifth Circuit in Southland Securities Corp., that "generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial."  334 F. Supp.2d at 1027 (quoting 365 F.3d at 372).  Judge Marbley revisited the issue of the materiality of generalized statements of corporate optimism in In re Cardinal Health Inc. Securities Litig., 426 F. Supp.2d 688 (S.D.Ohio 2006).  Therein, that judicial officer, relying upon the observations of the court in Brumbaugh v. Wave Sys. Corp., 416 F. Supp.2d 239, 250 (D.Mass. 2006), concluded that he would proceed "cautiously" when examining the defendants' argument that statements of corporate optimism were puffery, rather than being fraudulent misstatements.  Id. at 749 n. 70.  In Brumbaugh, the court indicated that in deciding whether a statement is immaterial and puffery, and, thus, not actionable, a court must first decide whether the statement "is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information," following which it must determine "whether the statement was also considered unimportant to the total mix of

---

provision tightens the scienter requirements for such statements, that statute did not per se prevent plaintiffs from recovering on the basis of such

information by the market as a whole." 416 F. Supp.2d at 250. This Court agrees

with Judge Marbley that it should proceed cautiously when addressing Defendants'

assertion that certain statements are not actionable, because they were puffery.

This Court will also apply to two-step test annunciated by the Brumbaugh court

when ruling on Defendants' assertion in that regard. With those standards in mind,

this Court turns to the allegations which the Defendants argue are generalized

statements of corporate optimism and, thus, immaterial. Moreover, as the

Plaintiffs point out (see Doc. #28 at 18), the context in which a statement is made

is essential in determining whether a statement is puffery. See e.g., Casella v.

Webb, 883 F.3d 805, 808 (9th Cir. 1989) (noting that "[w]hat might be innocuous

'puffery' or mere statement of opinion standing alone may be actionable as an

integral part of a representation of material fact when used to emphasize and

induce reliance upon such a representation").

With respect to the allegations set forth in ¶ 99 of the Amended Complaint,

this Court agrees with the Defendants that the statements in Huffy's Amended S-4

Registration Statement are so general as to be meaningless to the reasonable

investor. Indeed, in the allegedly actionable statements referred to ¶ 99, Graber,

Howard and Lafferty indicated that increased growth potential may result from the

merger and merely mention opportunities for savings and operational synergies.

Moreover, this Court rejects the Plaintiffs' argument (see Doc. #28 at 17) that

considering those statements in the entire context in which they were made

somehow renders them actionable.

However, the allegations in ¶¶ 104, 119, 141, 143, 147, 151, 152 and

155, do not constitute the type of vague, general, or loosely optimistic statements

that a reasonable investor would find unimportant. Therefore, this Court cannot

conclude that the allegations in those paragraphs are not actionable, because they are not material.

Third, the Defendants argue that they timely disclosed problems associated with Gen-X's accounts receivable.  See Doc. #24 at 49-51.  Initially, Defendants contend that such disclosure occurred during a conference call, commenting on Huffy's financial results for the Fourth Quarter of Fiscal Year 2002,[40] indicating that Huffy's accounts receivable had nearly doubled, almost all of which was attributable to the acquisitions of McCalla Company and Gen-X.[41]  As Plaintiffs argue, however (see Doc. #28 at 28-29), their allegations concerning accounts receivable are not merely predicated upon the theory that Huffy failed to disclose to shareholders that accounts receivable had increased as a result of the merger; rather, they base this aspect on their claims on the theory that Gen-X's accounts receivable were uncollectible.  Merely disclosing that accounts receivable had increased would not inform investors of that fact.  In addition, Defendants point to a conference call conducted on October 16, 2003, during which Graber indicated that working capital for Gen-X was a little higher on than desirable and that Huffy had "ramped up" a new software program which would allow it to refine the working capital model at Gen-X.  Telling the world that your "ramping up" software will refine a working capital model does not constitute disclosure that Gen-X's accounts receivable were not collectible.  For similar reasons, this Court rejects the Defendants arguments that they made timely disclosure of problems with Gen-X's

---

[40]That conference call was conducted on February 11, 2003.

[41]Huffy acquired the McCalla Company in the same time frame that it purchased Gen-X.  The acquisition of the McCalla Company does not figure in Plaintiffs' claims in this litigation.

accounts receivable, by indicating during a conference call, conducted on December 1, 2003, that Huffy was addressing problems with working capital at Gen-X.

In sum, although the Court has rejected most of the Defendants' challenges to Plaintiffs' allegations concerning accounts receivable, accounts payable and inventory reserves, it does agree that the allegations contained in ¶ 99 of Plaintiffs' Amended Complaint (Doc. #22) do not constitute actionable false or misleading statements.


2.  Increase in Administrative Expenses

Throughout the Amended Complaint, the Plaintiffs frequently allege that the Defendants provided misleading information by downplaying Gen-X's contributions to Huffy's increased selling, general and administrative expenses ("SG&A expenses").  In this section of their motion, the Defendants focus on the following allegations from the Plaintiffs' Amended Complaint (Doc. #22):

1.  The statements in a press release of July 16, 2002, indicating that the acquisition of Gen-X remained on schedule and its sales were tracking to its forecast, but that administrative costs had been driven higher that year by post-employment benefit costs and steep increases in insurance premiums (¶ 101);

2.  The statements in a press release of November 13, 2002, that the impact of the acquisition of Gen-X on Third Quarter earnings had been moderately accretive, that Huffy was pleased with the acquisition, that the sporting goods business continued to perform well in a challenging retail environment, that basketball backboards, the newly launched inflatable ball line, golf, action sports and inline skates recorded solid growth during the Third Quarter and that management was

particularly pleased that wheeled product sales had come in above plan with operating margins substantially improved over the previous year (¶ 109);

3.  The statements in a press release of January 9, 2003, that, despite the residual impact of the West Coast dock lockout, Huffy had been able to meet its shipping targets for the Fourth Quarter; and that continuing to meet those targets had caused it to incur additional costs incurred in the form of premium freight charges, demurrage and special surcharges on ocean-going containers which could reduce earnings by much as $0.07 per common share from earlier estimates (¶ 119);

4.  The statement in Huffy's press release of February 11, 2003, that Huffy expected to see benefits from its focus on cost reduction and operating efficiencies (¶ 120);

5.  Statements in Huffy's 10-K Report for Fiscal Year 2002 that the primary reason for the increase in SG&A expenses in 2002 was the acquisitions of Gen-X and the McCalla Company (¶ 126);

6.  Statements in Huffy's 10-Q Report for the First Quarter of Fiscal Year 2003 that the sales gains from the addition of Gen-X had been offset by sales decreases in the bicycle and backboard product lines, due to the overall weakness in the economy coupled with significant overstocked positions of competitors' products at the retail level; and that the primary reason for the increase in Huffy's SG&A expenses was the SG&A expenses added as a result of the acquisitions of Gen-X and the McCalla Company (¶ 136);

7.  The statement in Huffy's 10-Q Report for the Second Quarter of Fiscal Year 2003 that the primary reason for the increase in Huffy' SG&A expenses was the SG&A expenses added as a result of the acquisitions of Gen-X and the McCalla Company (¶ 143);

8.  The statement in Huffy's 10-Q Report for the Third Quarter of Fiscal Year 2003 that the primary reason for the increase in Huffy' SG&A expenses was the SG&A expenses added as a result of the acquisitions of Gen-X and the McCalla Company (¶ 155); and

9.  The statement in Huffy's press release of February 17, 2004, that, although it had posted a net loss of $7.5 million, or $0.49 per share and net sales of $437.7 million during Fiscal Year 2003, it expected to realize a profit of $0.22 to $0.27 per share in Fiscal Year 2004, on sales of $450 to $460 million (¶ 167).

In ¶¶ 139(b) and 148(b) of the Amended Complaint (Doc. #22), the Plaintiffs allege that Defendants' statements concerning Huffy's financial results for the First and Second Quarters of Fiscal Year 2003 were materially false and misleading, because, inter alia, those statements "masked the true cause and significance of Huffy's rising SG&A expenses" by "attributing it to other factors, including the timing of trade show advertising and previously forecasted increases in pension and insurance expenses" (First Quarter ¶ 139(b)); and by "failing to disclose that the costs were out of control and the increases were unexpected, and attributing increased costs to other factors" (Second Quarter ¶ 148(b)).  In addition, the Plaintiffs allege that Huffy's disclosures concerning financial results for the Third Quarter of Fiscal Year 2003 were materially false and misleading, because, inter alia, "statements attributing Huffy's net sales and gross profit growth to Gen-X while downplaying Gen-X's contribution to the increase in SG&A expenses and failing to disclose that expenses at Gen-X were much higher than anticipated, had the effect of misleading investors about the reasons for Huffy's financial performance and its future prospects for success."  Doc. #22 at ¶ 158(i). The Defendants have presented four reasons why the nine allegations set forth

above are not rendered false or misleading, for the reasons given by Plaintiffs and set forth in ¶¶ 139(b), 148(b) and 158(i).  The Court will discuss those arguments in the order presented by the Defendants.

First, the Defendants argue that, since Huffy disclosed that Gen-X was a primary contributor to its (Huffy's) soaring SG&A expense, "it is absurd for Plaintiffs to allege that Defendants 'masked the true cause … of Huffy's rising SG&A expense'" and Huffy has not downplayed Gen-X's contribution to those expenses.  Doc. #24 at 54.  This Court agrees with the Defendants.  As Plaintiffs allege in ¶¶ 136, 143 and 155 of their Amended Complaint (Doc. #22), Huffy disclosed in its 10-Q Reports for the First, Second and Third Quarters of Fiscal Year 2003 that the primary cause of its increased SG&A expenses was the addition of such costs as a result of the acquisitions of Gen-X and the McCalla Company.  Therefore, this Court agrees with the Defendants that the Plaintiffs' allegations that the Defendants provided false or misleading information to shareholders by masking or downplaying the true cause of the increase in Huffy's SG&A expenses are contradicted by other allegations in the Amended Complaint.  Consequently, the Defendants are entitled to dismissal of these allegations.  However, it must be noted that the Plaintiffs also allege that the Defendants masked the significance of the rise in that expense.  As the Defendants have not challenged Plaintiffs' allegations in that regard, nothing in this paragraph has any impact upon such allegations.  In other words, the Court will not dismiss the Plaintiffs' claims predicated upon masking the significance of the increase in SG&A

expense, as opposed to claims predicated upon masking that increase itself, which are dismissed.[42]

Second, the Defendants argue that, rather than failing to disclose an increase in SG&A expenses, they also disclosed that other factors contributed to that increase.  For instance, Defendants point to the press release of January 9, 2003, which discussed the impact of the West Coast dock lockout on Huffy's SG&A expenses (see Plaintiffs' Amended Complaint at ¶ 119).  Defendants also state that a fire that occurred at one of Huffy's suppliers, which caused its expenses to increase.  Whether any of those events ultimately negate the Plaintiffs' allegations at issue will have to be resolved in the context of ruling on a motion for summary judgment or at trial.

Third, Defendants argue that the increased SG&A expenses were part of a long-term strategy of growth involving the promotion of new product brands associated with Gen-X.  In support of that assertion, the Defendants rely upon statements in Huffy's 8-K Report for April 16, 2003, wherein a long-term advertising plan was announced.  Simply stated, whether such a program occurred, as is asserted in that Report, must be determined in ruling on a motion for summary judgment or at trial, rather than in the context of a motion to dismiss.  In

---

[42]Indeed, arguing that the Plaintiffs' Amended Complaint fails to include adequate allegations concerning the significance of Huffy's increased SG&A expenses would have been futile.  The Sixth Circuit has indicted that "[t]he context of statements is often telling."  City of Monroe, 399 F.3d at 672.  As Plaintiffs argue (see Doc. #28 at 46-47), the Defendants made the statements concerning the increased SG&A expenses in the context of touting Gen-X's performance and contributions to its (Huffy's) sales growth.  That context reinforces the allegation that the Defendants' statements concerning the increased SG&A expenses were misleading for failure to include mention of their significance.

other words, merely because Huffy indicated that it was planning to take certain steps in a document filed with the SEC does not mean that it took such steps.

Fourth, Defendants challenge the Plaintiffs' allegation in ¶ 158(e) of the Amended Complaint (Doc. #22), to the effect that Defendants had falsely assured investors that Huffy was achieving success in reducing its costs.  According to Defendants, Graber not only disclosed the reasons for the increase in Huffy's SG&A expenses, but also appraised investors of its efforts to contain those costs. In particular, Defendants point to the following statements from the press release issued on October 15, 2003:

> Margins for the third quarter were slightly down when compared to previous quarters and last year as the result of softness in the backboard business, the slippage of some snowboard sales into the fourth quarter, and overall lower than expected sales in action sports and the opportunity business.  Despite the overall lower sales and margin pressure, earnings from continuing operations were as forecast, the result of a continuing focus on cost containment and the recovery of legal expenses from prior periods that resulted in lower SG&A expenses during the quarter.

Doc. #22 at ¶ 151 (internal quotation marks omitted).  This Court agrees with Defendants that the Plaintiffs' allegations contained in ¶ 158(e) of the Amended Complaint, that Huffy had falsely assured investors that it was containing SG&A costs, is not supported by the above-quoted passage from ¶ 151 of that pleading. Consequently, the allegations in ¶ 158(e) do not survive the Defendants' Motion to Dismiss (Doc. #24).

## 3.  Disclosure Concerning Huffy's Debt and Liquidity (Ability to Meet Debt Covenants)

Plaintiffs also allege in the Amended Complaint that the Defendants misled investors concerning the amount of debt that Huffy was carrying and whether it

would retire its current debt at the time of the acquisition of Gen-X.  See Doc. #22 at ¶¶ 93 (alleging that the statements in the 10-Q Report for the First Quarter of Fiscal Year 2002, that Huffy was debt free and did not anticipate any borrowings for the remainder of the year, were false and misleading, because Huffy was then engaged in negotiations to acquire Gen-X and had already structured the transaction and signed a letter of intent to acquire Gen-X); 106(c) (alleging that statements in Huffy's financial reports for the Second Quarter of Fiscal Year 2002, regarding Huffy's debt-free balance sheet and that it would retire $44.7 million of Gen-X's existing debt, were false and misleading, because the acquisition of Gen-X had been structured in a manner that would require Huffy to assume, rather than to retire, Gen-X's debt, when the statements were made); 162 (alleging that, during a conference call conducted on December 2, 2003, Lafferty falsely assured investors that Huffy had a handle on Gen-X's debt and accounts receivable problems by assuring them that the debt, though higher than that with which management was comfortable, was manageable, by stating that Huffy was focused on working through its debt and trying to bring it down to levels with which management was more comfortable, because, although Huffy could finance that debt, management would prefer to operate with slightly less debt).  The Defendants argue that those allegations are not actionable, because they had truthfully disclosed what they knew, when they knew it.  In support of that assertion, the Defendants rely upon ¶ 90 of the Amended Complaint, wherein Plaintiffs set forth allegations concerning a press release issued by Huffy on April 16, 2002, the first day of the class period. In particular, Defendants point to the following passage in that press release:

> We have continued our focus on maintaining the strength of our balance sheet with tight control on working capital.  Our inventories remain at historically low levels as we continue to work closely with suppliers to

> insure timely delivery to our customers.  The Company remains debt free
> with close to $14.0 million in cash and investments at the end of the quarter
> and in our current configuration, we do not anticipate any borrowings as we
> move through the year.  As in the past, we continue to evaluate alternatives
> for profitable growth with Sheffield Merchant Banking.

Doc. #22 at ¶ 90.  According to Defendants, that statement is not false, because

it was focusing on Huffy in its "current configuration," under which it was debt

free.  Defendants also point to statements in the Amended S-4 Registration

Statement that Huffy's agreement with Gen-X was non-binding.  Simply stated,

the truth of the statements upon which Defendants rely to support this argument

must be tested with a motion for summary judgment after discovery or at trial,

rather than in the context of ruling on a motion to dismiss.  Based upon similar

reasoning, this Court rejects the Defendants' request that it dismiss the allegations

set forth in ¶¶ 158(c), 174(a) and 174(b) of the Amended Complaint,[43] because

those allegations were not false and, therefore, are not actionable.

    In addition, the Plaintiffs allege that the Defendants failed to report Huffy's

pension liabilities in accurate fashion, in order to conceal potential liquidity

problems.  See Doc. #22 at ¶¶ 75-77, 171, 174(f) and 175(f).  In particular, the

Plaintiffs contend that the Defendants falsely represented the extent of Huffy's

pension liabilities, because the 10-K Report filed at the end of 2003 indicated that

its unfunded liability was $31.7 million, slightly less than the amount reported at

the end of the previous year, while that amount had grown to $68.1 million when

---

[43]In ¶ 158(c), the Plaintiffs allege that statements in Huffy's financial releases for
the Third Quarter of 2003 were misleading, because those statements failed to
disclose the extent of its liquidity problems and its difficulty complying with its
debt covenants.  In ¶ 174(a) and (b), Plaintiffs make similar allegations concerning
the statements set forth in Huffy's various financial releases made at the end of
Fiscal Year 2003 and the First Quarter of 2004.

Huffy filed for bankruptcy on October 20, 2004.  <u>See</u> Doc. #22 at ¶ 76. According to the Defendants, these allegations are not actionable, because they are attenuated and illogical, given the 10-month period between the end of 2003 and Huffy's bankruptcy filing.  <u>See</u> Doc. #24 at 60.  This Court does not agree with Defendants that the mere passage of time is sufficient to demonstrate that the Plaintiffs have failed to allege that the they (Defendants) failed to report Huffy's pension liabilities in adequate fashion.  Defendants also contend that Plaintiffs have not alleged in adequate fashion that they (Defendants) acted with scienter when they allegedly failed to disclose Huffy's unfunded pension liabilities.  <u>See</u> 15 U.S.C. § 78u-4(b) (requiring that a complaint allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").  Although not raised in the section of their motion devoted to the scienter, this Court will briefly set forth its reasons for rejecting that argument.  Plaintiffs allege in ¶ 77 of their Amended Complaint that Huffy deliberately falsified the amount of pension assets in its Form 5500, filed on December 31, 2003.  That allegation is based upon information which the Plaintiffs have received from two confidential witnesses, the administrative assistant to a Huffy executive and an accountant who was employed by Huffy for the ten years.  Accordingly, the Court will not dismiss the allegations set forth in ¶¶ 75-77, 171, 174(f) and 175(f) of the Amended Complaint (Doc. #22).

## 4.  Huffy's Statements Regarding Due Diligence and the Accretive Benefits of the Gen-X Merger

Throughout their Amended Complaint, the Plaintiffs allege that the Defendants made numerous false and misleading statements concerning the quality

of the due diligence that was conducted before Huffy acquired Gen-X.  See e.g.,

Doc. #22 at ¶ 95 (alleging that Defendants had falsely stated in June 17, 2002,

press release, announcing acquisition of Gen-X, that extensive due diligence had

been conducted before it had agreed to that acquisition).  The Defendants argue

that such allegations are not actionable, given that Huffy reported on its S-4 and

Amended S-4 Registration Statements that it had retained KPMG and A.G.

Edwards to perform due diligence before agreeing to the acquisition.  Whether the

actions of those two entities constitute "extensive" due diligence must be

evaluated when ruling on a motion for summary judgment or at trial, after the

completion of discovery, rather than in the context of ruling on a motion to dismiss

for failure to state a claim upon which relief can be granted.


5.  Adequate Apprising of the Closing Date of the Gen-X Acquisition

       In the Amended Complaint, the Plaintiffs set forth lengthy allegations

concerning the allegedly false and misleading nature of statements concerning

Huffy's financial results for the Third Quarter of Fiscal Year 2002.  See Doc. #22

at ¶¶ 109-116.  Plaintiffs also allege that those statements were false, in part,

because "Defendants did not disclose that they had deliberately accelerated the

closing of the Gen-X acquisition, originally scheduled to close in the fourth quarter,

to prop up Huffy's third quarter financial results."  Id. at ¶ 117(a).  Defendants

argue that the latter allegation is not actionable, given that the closing of the Gen-

X acquisition occurred only a few days before the end of the Third Quarter and,

further, since Lafferty reported during the conference call conducted on November

14, 2002, that some of Huffy's increased sales for the third quarter had been the

result of Gen-X having joined Huffy a few days before its end.  This Court cannot

agree with Defendants that the combination of the fact that Gen-X was only part of Huffy for a few days in the Third Quarter of Fiscal Year 2003 and Lafferty's statement during that conference call necessarily negate the allegations set forth in ¶ 117(a) of the Amended Complaint.  Therefore, this Court will not dismiss the allegations set forth in ¶ 117(a).

6.  Defendants' Statements and Forecasts Regarding Huffy's Financial Performance Are Not Actionable under the PSLRA[44]

Defendants argue that a number of their allegedly false and/or misleading statements are forward-looking and, thus, not actionable under the safe harbor provision of the PSLRA.[45]  The Defendants present two separate propositions in support of this argument, which the Court addresses in the order presented.

First, Plaintiffs allege that the Defendants failed to inform investors, at the beginning of the class period, that Huffy was then experiencing an earnings slowdown.  Doc. #22 at ¶ 92.  According to Defendants, the basis for the

_____

[44]In the introduction to the section of their motion where Defendants addressed the falsity and materiality of the statements underlying this litigation, they identified this particular argument as "Defendants did not disclose Huffy's problems with Gen-X soon enough."  See Doc. #24 at 44.  When they addressed that argument in their memorandum, they used the above caption.  Id. at 63.  The two are related, because the allegedly misleading statements addressed by Defendants with this argument are predicated upon Plaintiffs' contention that Defendants failed to qualify those statements with information about alleged problems facing Huffy.

[45]As an initial matter, this Court rejects the Plaintiffs' assertion (see Doc. #28 at 21, 56) that the question of whether a particular statement has been immunized by the safe harbor provision in the PSLRA cannot be resolved when ruling on a motion to dismiss, given that the inquiry as to whether the cautionary statements were meaningful is inherently factual.  On the contrary, the Sixth Circuit has affirmed the decision of a District Court to dismiss a securities fraud claim, because some of the allegations were immunized by the safe harbor.  Champion Enterprises, 364 F.3d at 675.

Plaintiffs' allegation in that regard is explained by the allegedly false and misleading statements made by Graber in Huffy's press release of April 16, 2002,[46] discussing its results for the First Quarter of Fiscal Year 2002:

> January is traditionally a slow sales month as retailers adjust inventories following the holiday season and the Kmart bankruptcy filing in January certainly did not help the situation. However, as we moved through the quarter, sales of backboards and revenue from retail services have improved substantially when compared to last year, although bicycle sales continue to be slower than we would like. We are beginning to see our margins improve as the impact of the actions taken during the fourth quarter of 2001 take effect.
>
> As we move into the second quarter, we are encouraged by the recent sell through of durable goods at retail and by the expansion in our retail services. Our second quarter incoming orders are strong. We anticipate continued expansion in our service offerings, both as a result of internally developed initiatives such as the Lowe's outdoor power equipment program, and the recently announced acquisition of McCalla. Earnings for the remainder of the first half and the balance of the year are currently tracking to the higher end of our previously announced estimates of $0.10-$0.20 for the first half and $0.40-$0.60 for the year.

Doc. #22 at ¶ 90. The Defendants argue that the statements set forth in ¶ 90 are projections of future performance and immunized by the PSLRA, because they were accompanied by adequate cautionary language. This Court cannot agree with the Defendants that the statements from the April 16, 2002, press release are forward-looking. On the contrary, the language used by Graber therein describes events that were currently occurring, rather than discussing what might occur in the future.[47] Nor does the Court agree with Defendants that Graber's statement

---

[46]April 16th was the first day of the class period. Doc. #22 at ¶ 1.

[47]Defendants also argue that the alleged misstatements set forth ¶ 90 are not actionable, because they are nothing more than immaterial statements of corporate optimism. Although each statement, taken in isolation, might well be immaterial or puffing, this Court cannot agree that they are such when considered in the context in which Plaintiffs place them (i.e., that they serve as the basis of the allegation

that "sales of backboards and revenue from retail services have improved substantially when compared to last year" is not actionable, given that there had been such a comparative improvement and, thus, the statement is not false.  The Amended Complaint does not include allegations concerning those results from the First Quarter of Fiscal Year 2001, which would permit the Court to confirm the Defendants' assertion that the statement is true.

In addition, in its press release issued on November 13, 2002, announcing financial results for the Third Quarter of Fiscal Year 2003, Huffy stated that basketball backboards, the newly launched inflatable ball line, golf, action sports, and inline skates recorded "solid growth" during that quarter.  See Doc. #22 at ¶ 109.  Plaintiffs allege that the statement concerning "solid growth" in those product lines was materially false and misleading, because "Huffy was not experiencing 'solid growth' during the [third] quarter."  Id. at ¶ 117(d).  According to the Defendants, the allegation set forth in ¶ 117(d) is not actionable, given that Huffy merely stated that it was experiencing "solid growth" in a number of product lines, rather that claiming the company as a whole was experiencing such.  This Court agrees.  Moreover, this Court also agrees with the Defendants that the use of the term "solid growth" is the type of non-specific statements of corporate optimism, properly described as mere puffery which is not actionable, given that an investor would be required to retain a deconstructor to ascertain the meaning of "solid growth."  Therefore, this Court concludes that the allegations set forth in ¶ 117(d) of the Plaintiffs' Amended Complaint, concerning solid growth, are not actionable.

---

that Huffy failed to inform investors that its business was slowing down).

In its press release issued on February 17, 2004, announcing the results for the Fourth Quarter of Fiscal Year 2003 and that entire year, Huffy "claimed it expected to realize a profit of $0.22 to $0.27 per share in the coming (FY04) fiscal year, on sales of $450 to $460 million." See Doc. #22 at ¶ 167.  In ¶ 174(d) of the Amended Complaint (Doc. #22), the Plaintiffs allege that "[g]iven the extent and severity of the liquidity and supplier problems facing Huffy, there was no reasonable basis on which to project that the Company would be profitable in [fiscal year 2004]."  The Defendants argue that the forecast for fiscal year 2004 is forward-looking and, thus, immunized by the safe harbor provision in the PSLRA, because it contains the requisite cautionary language.  The press release itself provides that it "contains forward-looking statements and is qualified by the cautionary statements contained in Company's report on Form 10-K, dated February 20, 2003."  Doc. #24 at Ex. 43, p. 4 (unnumbered).  In that 10-K Report, Huffy cautioned that statements containing words such as "expect" were forward-looking.[48]  Id. at Ex. 24.  Therefore, the Court concludes that the above-quoted statement from ¶ 167 of the Amended Complaint expressly refers to a forward-looking statement.  Moreover, that report contained "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" (15 U.S.C. § 78u-5(c)(1)(A)(i)).  See Id.  Accordingly, the Court concludes that, pursuant to the PSLRA, the Defendants are immune from liability for the quoted statement set in ¶ 167 of the Amended Complaint, alleged to be false and misleading by ¶ 174(d).

---

[48]The Plaintiffs have extensively referred to that report, including its cautionary language, in their Amended Complaint.  See Doc. #22 at ¶¶ 124-128.

Second, the Defendants argue that their continued optimism about the acquisition of Gen-X constitutes nothing more that immaterial puffery, rather than being actionable under the PSLRA.  In particular, the Defendants contend that, therefore, the allegations in ¶¶ 106(c), 119, 129(e), 139(c), 139(h), 148(c) and 161 of the Amended Complaint are not materially false or misleading.  See Doc. #24 at 67.  Although not specifically so stating, the Defendants imply that the statements set forth in those portions of the Amended Complaint are forward-looking projections.  This Court cannot agree, given that each such statement states the speaker's current belief.  Moreover, this Court rejects the Defendants' assertion that the statements in question are immaterial puffery, rather than being actionable.  That argument ignores the context in which Plaintiffs would put those allegations, to wit: that they were made at a time that the Defendants knew that Gen-X was mired in problems associated with, inter alia, its accounts receivable, accounts payable and inventory, yet Huffy management continued to laud the acquisition of that entity.  Accordingly, the Court rejects the Defendants' assertion that the allegations in ¶¶ 106(c), 119, 129(e), 139(c), 139(h), 148(c) and 161 of the Amended Complaint are subject to dismissal under Rule 12(b)(6), because they are not materially false or misleading.

In addition, Plaintiffs allege that, near the end of 2003, a confidential informant witnessed Lafferty make a misleading presentation to a group of underwriters and insurance brokers, leading them to believe that the Gen-X acquisition was going well and that Huffy was poised to turn a profit, when he knew it was not.  Doc. #22 at ¶ 54.  The Plaintiffs have not set forth therein what Lafferty is alleged to have said.  In a footnote, the Defendants argue that the allegation in ¶ 54 must be dismissed, because it fails to include the requisite

particularity.  As is indicated above, Rule 9(b) requires that allegations of fraud contain, <u>inter alia</u>, "the time, place, and content of the alleged misrepresentations." <u>Sanderson v</u>, 447 F.3d at 877.  This Court agrees with the Defendants that ¶ 54 fails to comply with Rule 9(b), given that the content of the misrepresentations is missing.  Accordingly, the Court will dismiss the allegations set forth in ¶ 54 of the Amended Complaint.

7.  <u>Defendants Permitted Violations of GAAP by Huffy</u>

Defendants argue and present five propositions in support of the argument that the Plaintiffs' allegations in the Amended Complaint do not demonstrate a violation of GAAP, which this Court addresses in the order presented.

<u>First</u>, in a number of places in the Amended Complaint, the Plaintiffs allege that the Defendants permitted Huffy to overvalue the trademarks, goodwill and other intangible assets it obtained as a result of the acquisition of Gen-X, in order to avoid taking periodic writedowns that would have resulted in a charge against earnings, if the value of those assets had reflected their value on Gen-X's books, prior to the acquisition, and the price for which Huffy sold them within a short time after acquiring them.  <u>See</u> Doc. #22 at ¶¶ 129(f), 139(e), 148(e), 158(g) and 174(g). In addition, the Plaintiffs allege that Gen-X valued its trademarks at $11.5 million, on June 30, 2002.  <u>Id</u>. at ¶ 62.  Three months later, Huffy valued those trademarks at $45 million in 10-Q Report for the Third Quarter of Fiscal Year 2002. <u>Id</u>. at ¶¶ 191-192.  The Amended Complaint also contains detailed allegations as to why Huffy's valuation of the trademarks is false and misleading.  <u>Id</u>. at ¶¶ 196-206.   The Defendants argue that those allegations "do not show a violation of GAAP and are not actionable under the PSLRA."  Doc. #24 at 69.  The Defendants

do not, however, explain why the Plaintiffs' allegations concerning the overvaluation of Gen-X's trademarks, goodwill and other intangible assets fail to show a violation of GAAP, other than arguing that their valuation of Gen-X's trademarks was not false or misleading, because they intended to use them in mass marketing.  It is axiomatic that "[t]he fair market value of a trademark is the price a willing purchaser would have paid a willing seller to buy the mark." Nestle Holdings, Inc. v. C.I.R., 152 F.3d 83, 88 (2d Cir. 1998).  Simply stated, it is not possible for this Court to conclude, in the context of ruling on a motion to dismiss under Rule 12(b)(6), that the Plaintiffs' allegations concerning the valuation of Gen-X's trademarks lack factual support.[49]  Accordingly, the Court rejects the Defendants' request to dismiss the Plaintiffs' allegations that the valuation of the trademarks, goodwill and other intangible assets acquired from Gen-X were overvalued.

Second, Plaintiffs allege in the Amended Complaint that the Defendants improperly allowed Huffy to recognize deferred tax assets.  Doc. #22 at ¶¶ 117(b) and 207-212.  According to Plaintiffs, and not presently disputed by Defendants, GAAP, as set forth in Statement of Financial Accounting Standards No. 109, recognition of deferred tax assets, which can be used as deductions against future income, is permitted only if it is more likely than not that sufficient future taxable income will be generated to permit the use of such deductions in the future.  Id. at

---

[49]The Defendants also argue that Plaintiffs' allegations would support a finding of negligence, not the requisite scienter.  However, this portion of the Defendants' motion is devoted to the assertion that the Plaintiffs have failed to allege materially false or misleading statements.  See Doc. #24 at 2 (the first) (describing in such terms the section of Defendants' motion in which their challenges to Plaintiffs' allegations concerning GAAP appear); Id. at iii-v (same).  The Court has discussed the issue of scienter above, when addressing the portion of Defendants' motion devoted to that subject.

¶ 207.  Plaintiffs allege that "[a]s reflected in its pre-merger financial statements, it was highly unlikely that Gen-X would generate sufficient taxable income to support utilization of the deferred tax assets before they expired."  Id. at ¶ 209.  The Defendants contend this allegation is conclusory and that the Plaintiffs have failed to allege why it was highly unlikely that Gen-X would fail to generate sufficient assets to permit the deferred tax assets to be utilized, in effect arguing that the Plaintiffs have failed to set forth in the Amended Complaint the evidence that will support this allegation.  Given that no provision in the PSLRA, and neither Rule 9(b) nor Rule 12(b)(6), requires that a plaintiff provide such detail (i.e., the evidence that would support a plaintiff's allegations) when setting forth the allegedly false or misleading statements by the defendant, this Court rejects the Defendants' contention that Plaintiffs' allegations concerning deferred tax assets are not actionable and must be dismissed.

Third, Plaintiffs allege that Huffy violated GAAP, by failing to report the results of Gen-X as a separate operating unit.  Doc. #22 at ¶¶ 129(g), 139(g), 148(g), 158(h), 174(h) and 216-225.  In particular, Plaintiffs rely upon Financial Accounting Statement No. 131 ("FAS 131"), which is part of GAAP.  Id. at ¶ 219.  Therein, the Plaintiffs allege that FAS 131 requires that an operating segment be reported separately, if its revenues make up 10% or more of all revenues, its total loss or profit is 10% or more of the total loss or profit, or its assets are 10% or more of the total assets.  Id. (citing ¶ 18 of FAS 131).  The Defendants argue that the Plaintiffs have misread FAS 131, because, under ¶ 16, separate reporting for an operating segment is required only if one of the quantitative thresholds set forth in ¶ 18 has been met and has been identified as an operating segment in

accordance with ¶¶ 10-15.[50]  Although the Defendants do not challenge that

Plaintiffs have adequately alleged that one or more of the quantitative thresholds

set forth in ¶ 18 has been met, they (Defendants) argue that Plaintiffs have failed

to allege that the a threshold for separate reporting for Gen-X would be recognized

in accordance with ¶¶ 10-15 of FAS 131.  Of particular present importance, an

operating segment is defined by ¶ 10, as having the following three characteristics,

to wit: 1) engaging in business activities from which it may earn revenues and

incur expenses; 2) having its results regularly reviewed by the chief decision maker

of the enterprise to make decisions about resources to be allocated to the segment

and to assess its performance; and 3) having discrete financial information

available.  Simply stated, the allegations set forth in ¶ 222 of the Amended

Complaint and its sub-parts cause this Court to conclude that the Plaintiffs have

adequately alleged that Gen-X meets the qualitative criteria set forth in ¶ 10 of

FAS 131.[51]  Accordingly, the Court rejects the Defendants' assertion that it must

dismiss the aspect of Plaintiffs' Amended Complaint based upon their asserted

violation of FAS 131.

---

[50]Defendants have appended a copy of a portion of FAS 131 to their motion.  See Doc. #24 at Ex. 59.

[51]In so concluding, the Court does not agree with the Defendants that their request to dismiss Plaintiffs' allegations that they violated GAAP by failing to report the results of Gen-X separately is supported by Smith v. Circuit City, 286 F. Supp.2d 707, 718 (E.D.Va. 2003), because the Plaintiffs herein, like the plaintiffs in that litigation, have failed to set forth this aspect of their claims with particularity.  In Smith, the court dismissed the plaintiffs' claim predicated upon FAS 131, because they had failed to allege scienter with particularity, as required by the PSLRA. Herein, in contrast, the Defendants argue that this Court must dismiss the aspect of Plaintiffs' claims predicated upon FAS 131, because Plaintiffs allegations that they violated that GAAP were not made with sufficient particularity.  For the reasons set forth above, this Court has rejected that assertion.

Fourth, the Plaintiffs have alleged in the Amended Complaint that Huffy announced the restatement of its financial results for 2003.  See Doc. #22 at ¶¶ 230-234.  The Defendants argue that the restatement of financial results is not actionable under the PSLRA.  This Court does not agree.  Courts have held that the mere fact that financial results are restated is sufficient at the pleading stage to establish that results were false when originally made.  Caiafa v. Sea Containers Ltd., 525 F. Supp.2d 398, 410 (S.D.N.Y. 2007); In re Cylink Securities. Litig., 178 F. Supp.2d 1077, 1084 (N.D.Cal. 2001); In re Telxon Corp. Securities Litig., 133 F. Supp.2d 1010, 1026 (N.D.Ohio 2000).[52]

Fifth, the Defendants argue that the Plaintiffs' allegations of other violations of GAAP, set forth in ¶¶ 213-215, 226-229 and 235-236 of the Amended Complaint (Doc. #22), "fail to state a claim because Plaintiffs do not identify the particular transactions underlying these allegedly improper accounting practices."  Doc. #24 at 75.  The Defendants have only addressed the allegations set forth in ¶¶ 213, 228-229 and 235-236 of the Amended Complaint.[53]  The Court addresses the Defendants arguments in the order presented.

---

[52]In support of their argument in this regard, the Defendants rely on Merzin v. Provident Financial Group, 311 F. Supp.2d 674, 683-84 (S.D.Ohio 2004), wherein the court held that the plaintiffs had failed to allege a strong inference that the defendants had acted with scienter when they originally stated financial results, merely because they restated them.  In this portion of its Decision, the Court is addressing, not the issue of the requisite scienter, but rather the Defendants' assertion that the statements upon which the Plaintiffs base this lawsuit were not materially false or misleading.  The Court has addressed the adequacy of the Plaintiffs' allegations of scienter, above.

[53]In ¶¶ 214-215, the Plaintiffs include allegations of the pertinent GAAP which were allegedly violated as a result of the Defendants' actions set forth in ¶ 213.  Similarly, ¶¶ 226-227 contain allegations of the pertinent GAAP which were allegedly violated as a result of the Defendants' actions set forth in ¶¶ 228-229.

1.  In ¶ 213 of the Amended Complaint, the Plaintiffs allege that Defendants

"deliberately understated Huffy's expenses so that the Company could

report inflated profitability or reduced losses during the Class Period, including

failing in timely fashion to writedown the impaired value of its assets, establish

appropriate reserves for doubtful accounts, or record charges for customer

deductions and credits in the periods in which they were due" and that they "have

admitted that Huffy failed to timely record at least $3.5 to $5.0 million in customer

deductions, credits, and reserves for doubtful A/R [accounts receivable] and

inventory in FY03, in violation of GAAP."  Simply stated, this Court is not able to

agree with the Defendants that the Plaintiffs have failed to set forth, with

particularity in ¶ 213, what actions are alleged to have violated GAAP.

2.  The Plaintiffs also allege:

> 228.  Huffy violated GAAP and SAB No. 101 by improperly recognizing $1 million in revenues from a purported agreement with one of its distributors in China.  According to CW7, a May 2003 fire at the plant of one of its snowboard suppliers delayed shipment of goods, resulting in a negotiated deal to pay Huffy $1 million in financial penalties for missed shipping deadlines.  CW7 said the $1 million was immediately booked as revenue, before payments were due or had been received.  CW7 said Huffy only ever collected about $200,000 of the $1 million credit.

> 229.  Huffy also had a recoverable insurance claim for the loss that it never filed.  According to CW7, the insurer had agreed to pay the claim but required documentation of the loss, which would have required a forensic accountant to review Gen-X's books.  CW7 said that neither Lafferty nor Finklestein (Gen-X's CFO) responded to repeated requests for assistance in pulling the required information.  After repeated attempts to collect the necessary information, CW7 was told by a Huffy employee involved in sorting out Gen-X's financial problems that Gen-X would not cooperate because it did not want a forensic accountant to review the revenue treatment of the $1 million supplier credit.

Doc. #22 at ¶¶ 228-229.  Defendants contend that the Plaintiffs have failed to set

forth the details concerning those allegations with particularity, given that Plaintiffs

have not identified the vendor or the details of the negotiation or the terms of the

resulting agreement.  In the absence of authority on point that the PSLRA, Rule

9(b) or Rule 12(b)(6), requires such pleading contain such detail, the Court cannot

agree with the Defendants that the allegations set forth in ¶¶ 228 and 229 lack

the requisite particularity.

3.  The Plaintiffs allege further in the Amended Complaint:

> 235.  In addition to the accounting violations noted above, Huffy presented its financial statements in a manner which also violated at least the following provisions of GAAP:
>
> (a) The concept that financial reporting should provide information that is useful to present and potential investors, creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶34);
>
> (b) The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);
>
> (c) The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);
>
> (d) The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);
>
> (e) The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

(f) The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79);
(g) The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97).

236.  The Company's Class Period Reports on Forms 10-Q filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

Doc. #22 at ¶¶ 235-236.

Simply stated, the allegations set forth in ¶¶ 235 and 236 do not comport with the particularity requirements of Rule 9(b), that an allegation of fraud, inter alia, set forth the content of the misrepresentations on which the plaintiff allegedly relied.  Sanderson, 447 F.3d at 877.  The Plaintiffs have not explained which of the many statements which underlie this litigation violated the various concepts discussed in ¶ 235, nor have they indicated what known trends, etc., the Defendants omitted from which 10-Q Reports.  Accordingly, the Court agrees with Defendants that it must dismiss ¶¶ 235 and 236.

8.  Defendants Recklessly Signed Sarbanes-Oxley Certifications

Throughout the Amended Complaint, the Plaintiffs allege that Graber and Lafferty signed various reports which Huffy was required to file with the SEC and that, as a result, they made a number of certifications required by § 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241.  See Doc. #22 at ¶¶ 114, 118(e), 127, 129(e), 138, 140(e), 145, 149(e), 157, 159(f), 173 and 175(e).  The

Defendants argue that these allegations are not separately actionable.  Rather, according to the Defendants, Sarbanes-Oxley certifications are confirmations of statements made by them and incorporated into Huffy's filings with the SEC, rather than being separate and distinct misrepresentations.[54]  In the absence of a reasoned argument to the contrary, this Court agrees with Defendants and will follow the example of the court in In re Kindred Healthcare, Inc. Securities Litig., 299 F. Supp.2d 724 (W.D.Ky. 2004), and "not analyze [the certifications,] because they were just confirmations of other statements that the Court [has reviewed] independently."  Id. at 732 n. 8.

V.  Control Person Liability

As is indicated, control person liability can be imposed under § 20(a) of the Exchange Act.  In PR Diamonds, Inc., supra, the Sixth Circuit held that a claim under § 20(a) is comprised of two elements, to wit: 1) an underlying violation of securities laws committed by the "controlled person;" and 2) direct or indirect control by the defendant, the "controlling person," over the controlled person.  364 F.3d at 696.  Therein, the Sixth Circuit also noted that the SEC has defined control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  Id. at 696-97 (citing 17 C.F.R. § 230.405).  See also In re Suprema Specialties, Inc. Securities Litig., 438 F.3d

---

[54]Parenthetically, a Sarbanes-Oxley certification is not, in and of itself, probative of scienter.  See e.g., Central Laborers Pension Fund v. Integrated Electrical Services, Inc., 497 F.3d 546, 554 (5th Cir. 2007); Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006); In re Take-Two Interactive Securities Litig., 551 F. Supp.2d 247 (S.D.N.Y. 2008).

256, 285 (3d Cir. 2006) (when company is in bankruptcy, plaintiffs must demonstrate that company committed securities fraud in order to hold officers liable under a control person theory).

The Plaintiffs' Amended Complaint sets forth allegations concerning the positions each of the Defendants occupied at Huffy during the relevant period.  See Doc. #22 at ¶¶ 14-17.  This Court has reviewed those allegations above.  See supra at 1-2.  The Plaintiffs also assert in that pleading that, by virtue of their positions at Huffy, the Defendants had access to undisclosed adverse information in its records and they were privy to and participated in the development and reporting of Huffy's budgets, plans, projections and/or reports, while being familiar with and advised by the other Defendants about its finances, operations and sales at all relevant times.  Id. at ¶¶ 269-270.  In addition, the Plaintiffs set forth allegations concerning information supplied by various confidential informants, as support for the allegations set forth in ¶¶ 269-270.[55]  Id. at ¶¶ 271-274.   In their Memorandum in Opposition to the Defendants' Motion to Dismiss, the Plaintiffs clarify that their control person theory under § 20(a) is predicated upon the assertion that the Defendants controlled Huffy, which was the primary violator.  Doc. #28 at 84.

Defendants contend that the Court must dismiss Plaintiffs' claim under ¶ 20(a), because there has not been an underlying violation of the securities laws by the controlled person.  See Doc. #24 at 83.  In particular, the Defendants note

---

[55]Plaintiffs have also set forth allegations which support their premise that the group pleading doctrine is applicable and that, therefore, it is appropriate to treat the Defendants as group for pleading purposes.  Id. at ¶ 275.  Above, however, this Court has concluded that the group pleading doctrine did not survive the enactment of the PSLRA, assuming that the doctrine would have been recognized by the Sixth Circuit before that legislation.

that liability under § 20(a) "is an alternative, not a supplement, to primary liability

under § 10(b) and Rule 10b-5.'"  Id. (quoting PR Diamonds, 364 F.3d at 697 n. 4).

Defendants argue:

> In this case, Plaintiffs allege 10(b) violations against Defendants as
> well as § 20(a) allegations of control person liability.  Compl. ¶ 278.
> However, Plaintiffs do not allege that the "primary violator" of the securities
> laws is the Company or the other Defendants.  Rather, they predicate
> liability on the Defendants' ability to "control the content of the various SEC
> filings, press releases and other public statements pertaining to the Company
> during the Class Period."  Compl. ¶ 278.  Such an allegation does not
> establish § 20(a) liability on the Defendants.

Id.  In addition, Defendants assert that the Plaintiffs have not alleged sufficient

facts to establish that they exercised control over Huffy.  In particular, Defendants

focus upon D'Aloia before he became CEO of Huffy and Graber after he retired.  In

addition, they point out that Howard and Lafferty controlled only parts of Huffy.[56]

In response, the Plaintiffs note that the PSLRA does not contain a

heightened pleading requirement for control person liability under § 20(a) and

contend that they have met the notice pleading requirement applicable to motions

under Rule 12(b)(6).  Construing the Amended Complaint in the manner most

favorable to the Plaintiffs, as it must,[57] this Court concludes that the Plaintiffs have

---

[56]Defendants also argue that the Plaintiffs have failed to allege specific facts
establishing culpable participation in the fraud perpetrated by the controlled person.
See Doc. #24 at 84.  However, when it listed the two essential elements of a
claim under § 20(a), in PR Diamonds, the Sixth Circuit did not recognize such as
one of those elements.  364 F.3d at 696.  Therefore, the asserted failure of the
Plaintiff to allege such facts does not serve as the basis for dismissing this claim.

[57]See e.g., ITT Industries, Inc. v. Borg Warner, Inc., 506 F.3d 452, 457 (6th Cir.
2007) (noting that, when ruling on a motion to dismiss under Rule 12(b)(6),
"district court must accept as true all the allegations contained in the complaint
and construe the complaint liberally in favor of the plaintiff") (quoting Kottmyer v.
Maas, 436 F.3d 684, 688 (6th Cir. 2006) (internal alterations omitted).

alleged that Huffy, the controlled person, committed violations of Rule 10b-5.  The Amended Complaint is based in large measure on Huffy's statements in press releases and filings with the SEC.

In addition, this Court concludes that the Plaintiffs have adequately alleged that the Defendants (other than D'Aloia before he became its CEO in January, 2004) controlled Huffy.  With respect to D'Aloia before that event, the Amended Complaint is devoid of allegations that he possessed "direct or indirect … power to direct or cause the direction of the management and policies of [Huffy], whether through the ownership of voting securities, by contract, or otherwise."  PR Diamonds, 364 F.3d at 696-97 (citing 17 C.F.R. § 230.405).  In other words, with respect to their control person theory against D'Aloia, Plaintiffs have not met their obligation of providing "more than labels and conclusions or a formulaic recitation of the elements of the cause of action."  League of United Latin American Citizens, 500 F.3d at 527.

Therefore, other than D'Aloia before he became Huffy's CEO, the Court rejects the Defendants' assertion that control person liability cannot be imposed upon them.  However, the Plaintiffs may not recover under that theory for statements which the Court has concluded above were not false and misleading.

Based upon the foregoing, the Court sustains in part and overrules in part the Defendants' Motion to Dismiss (Doc. #24).  The Court has sustained that motion as it relates to the Plaintiffs attempt to impose personal liability on D'Aloia for statements made before December 2, 2003, and control person liability before he became CEO of Huffy; the allegations in ¶ 99 of the Amended Complaint; the allegation in ¶ 158(e) that "Huffy's cost containment efforts were succeeding;" the

statement concerning "solid growth" set forth in ¶ 117(d) of the Amended Complaint; the allegations in the Amended Complaint that Defendants masked the increase in SG&A; the statement in ¶ 167 of that pleading that Huffy "claimed it expected to realize a profit of $0.22 to $0.27 per share in the coming (FY04) fiscal year, on sales of $450 to $460 million," as alleged to be false in ¶ 174(d); the allegation in ¶ 54 that Lafferty made a misleading presentation to a group of underwriters and insurance brokers, leading them to believe that the Gen-X acquisition was going well and that Huffy was poised to turn a profit, when he knew it was not; and the allegations in ¶¶ 235 and 236.  In addition, the Court has concluded that the Sarbanes-Oxley certifications, set forth in ¶¶ 114, 118(e), 127, 129(e), 138, 140(e), 145, 149(e), 157, 159(f), 173 and 175(e), are not separately actionable.  Otherwise, the Court has overruled the Defendants' motion.[58]


September 17, 2008

                                        /s/ Walter Herbert Rice
                              _____
                                  WALTER HERBERT RICE, JUDGE
                                  UNITED STATES DISTRICT COURT

_____

[58]Recently, the Defendants filed an additional motion, seeking leave to file a supplemental memorandum in support of their Motion to Dismiss.  See Doc. #71.  That motion is sustained.  In the memorandum attached to that motion, Defendants contend that a recent decision, In Re Diebold Securities Litigation, Case No. 5:05cv2873 (N.D.Ohio Aug. 22, 2008), supports their request that this Court dismiss the claims set forth in Plaintiffs' Amended Complaint.  The Plaintiffs, in contrast, argue that Diebold is not persuasive authority, because that decision does not follow Tellabs, supra.  In Diebold, the court, after reviewing the allegations in the plaintiffs' amended complaint, concluded that the plaintiffs had failed to allege scienter in adequate fashion and that, therefore, that litigation had to be dismissed.  Putting aside the Plaintiffs' argument that the Diebold court failed to follow Tellabs, this Court's conclusions above concerning the allegations in Plaintiffs' Amended Complaint are not altered by the fact that another court, examining different allegations before it, concluded that scienter had not been adequately plead.

Copies to:

Counsel of Record.